# EXHIBIT A

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

|  |  |
|---|---|
| **ROBERT FEEMAN, individually, and on behalf of all others similarly situated,** |  |
|  |  |
| **Plaintiff,** | **CASE NO.:** |
|  |  |
| **v.** | **CLASS ACTION** |
| **BRIDGE IT, INC., d/b/a BRIGIT,** | **DEMAND FOR JURY TRIAL** |
|  |  |
| **Defendant.** |  |

## <u>CLASS ACTION SUMMONS</u>

Plaintiff designates NEW YORK COUNTY as the place of trial. The basis of venue is the defendant's residence. Defendant BRIDGE IT, INC., d/b/a BRIGIT has a principal place of business at 36 West 20th Street, Floor 11, New York, NY 10011.

*To the above-named Defendant:*

**YOU ARE HEREBY SUMMONED** and required to serve upon THOMAS M. MULLANEY, ESQ., whose address is 530 Fifth Avenue, 23RD Floor, New York, New York, 10036, an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, if served upon you personally within the State of New York, or within thirty (30) days if served upon you outside of the State of New York and/or by other than personal means. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

/s/ Thomas M. Mullaney
Thomas M. Mullaney
Attorney for Plaintiff

Dated: New York, New York
March 20, 2025

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

| | |
|---|---|
| **ROBERT FEEMAN, individually, and on behalf of all others similarly situated,** | |
| **Plaintiff,** | **CASE NO.:** |
| **v.** | **CLASS ACTION** |
| **BRIDGE IT, INC., d/b/a BRIGIT,** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

### CLASS ACTION COMPLAINT

Plaintiff Robert Feeman, a Chief Petty Officer in the United States Navy ("Plaintiff" or "CPO Feeman"), on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, and brings this Class Action Complaint against Bridge IT, Inc. (D/B/A Brigit) (hereafter, "Brigit" or "Defendant") and alleges as follows:

### I.     NATURE OF THE ACTION

1.     This Complaint seeks to protect active-duty military service members from Brigit's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA") and the Truth in Lending Act, 15 U.S.C. § 1638 ("TILA"). The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Borrowers") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household

1

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

stability, security clearances, and career advancement. Notably here, Brigit makes no effort to fulfill its duty to determine whether it is lending to Covered Borrowers or to provide legally mandated protections for them.

2.    Brigit is in the business of payday lending through an earned wage access ("EWA") product—it makes funds available to its customers, who repay Brigit principal and finance charges (including expedite fees and monthly subscription charges) on payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as having "no interest," in practice, Brigit routinely takes in *triple*-digit finance charges from its borrower customers. Defendant issued Plaintiff many of these predatory instant cash loans, with several exceeding **300%** military APR, nearly ten times the legal limit. The end result is a financial product that extracts exorbitant fees from workers, encourages serial usage and dependance on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

3.    CPO Feeman has used Brigit's "Instant Cash" product for more than a year. By virtue of, *inter alia*, the sky-high fees charged for these cash advance loans, Brigit has extended consumer credit to Plaintiff on numerous occasions in violation of the MLA and TILA.

4.    Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products can trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendant's "Instant Cash" transactions are in reality extensions of consumer credit.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

5.      In violation of the MLA, Defendant uses its Instant Cash product to saddle Covered Members with charges that yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

6.      Brigit's consumer credit agreements violate the MLA in at least four ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any required MLA Disclosures; (3) including a class action and jury trial waiver; and (4) including a mandatory binding arbitration clause. 10 U.S.C. § 987(b), (c) & (e)(1)(2)(5)(6).

7.      Brigit systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

8.      Among the abusive lending practices the MLA was designed to curb was predatory payday loans made to servicemembers.[1] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[2] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

_____

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.
[3] *Id.* at 10–11.
[4] *Id.* at 11.

3

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

9.      Brigit's business practices violate the MLA and TILA and are part of a systematic nationwide policy and practice. CPO Feeman seeks to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## II.     PARTIES

10.     At all times relevant, CPO Feeman was a natural person and resident of North Carolina. He has been a member of the U.S. Navy since 2008 and is a currently a chief petty officer stationed at Fort Bragg in North Carolina.

11.     During the class period, CPO Feeman was a Covered Borrower and an active-duty service member employed by the U.S. Navy.

12.     Defendant Bridge IT, Inc. (doing business as "Brigit") is a Delaware corporation with its principal place of business at 36 West 20th Street, Floor 11, New York, NY 10011.  Brigit transacts or has transacted business in this District and throughout the United States. Through its digital-technology platform, including its website and mobile app, Brigit has offered, brokered, and extended online installment loans, engaged in the servicing and collections of such loans, and provided other financial products and services to consumers, as described below.

13.     Brigit has offered loan agreements to consumers, including Covered Borrowers, since at least 2019, entering into millions of credit transactions.

## III.     JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over Defendant because Defendant conducts business in this State and keeps its headquarters in New York, New York.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

15.     Additionally, the terms of service for Brigit's Instant Cash product provide for exclusive jurisdiction in New York, New York.[5] Jurisdiction and venue are therefore proper in this Court.

## IV.    LEGAL BACKGROUND

### a.    The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered Members

16.     The DoD's Report on lending practices discussed the payday lending industry at length.[6] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[7]

17.     Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[8] Moreover, the military payment architecture and the Uniform Code of Military Justice to which servicemembers are bound make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[9]

---

[5] "Any Dispute[] not subject to the Arbitration Agreement shall be resolved in the federal or state courts of New York, New York. You and Brigit consent to venue and personal jurisdiction there." https://www.hellobrigit.com/terms (last visited Mar. 16, 2025).

[6] Report, *supra* n.1.

[7] *Id.* at 10–11.

[8] *Id.* at 11.

[9] *Id.* at 14. To be sure, EWA providers like Brigit do not collect physical checks from their customers at loan initiation but instead takes a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.

5

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

18.     While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[10] Those loans, like Brigit's, "are delivered and collected online through electronic fund transfer." [11]

19.     The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate Brigit's business model:

> (1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

> (2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[12]

> (3) . . . Increasingly the Internet is used to promote loans to Service members.

> (4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

> . . .

> (6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[13]

---

[10] *Id.* at 15.
[11] *Id.* at 16.
[12] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.
[13] *Id.* at 21–22.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

20.     The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[14] As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[15]

21.     Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[16]

22.     To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[17]

23.     The American Bar Association and Navy-Marine Corps Relief Society likewise submitted letters in support of the DoD's request, noting the "urgent need for remedial Congressional action" to curb predatory loan practices harming Service members.[18]

24.     Congress answered the call and passed the MLA to protect Covered Borrowers from unfair, deceptive, and excessively priced loans.

---

[14] *Id.* at 39.

[15] *Id.* at 41–42.

[16] *Id.* at 46.

[17] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

[18] *Id.* at 54–56.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

### b. The Military Lending Act

25.    In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

26.    The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

27.    The MLA also requires mandatory disclosures in "consumer credit" [19] transactions with Covered Borrowers, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

28.    Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that requires the Covered Borrow to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

29.    The MLA also makes it unlawful to charge a Covered Borrower any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

---

[19] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

8

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1                                                                RECEIVED NYSCEF: 03/20/2025

Case 1:25-cv-03806-LJL    Document 1-1    Filed 05/07/25    Page 12 of 33

### c. The Truth in Lending Act

30.     The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

31.     Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those Brigit offers here. Brigit fails to make any of the following required disclosures:

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *id.* at § 1638(2)(B);

- "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

- "The finance charge expressed as an 'annual percentage rate', using that term," *id.* at § 1638(4);

- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *id.* at § 1638(6);

- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *id.* at § 1638(8);

- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B)

9

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

property not purchased as part of the credit transaction identified by item or type," *id.* at § 1638(9);

- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *id.* at § 1638(11); and

- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *id.* at § 1638(12).

## V. FACTS

### a. The Earned Wage Product Market and Brigit

#### i. EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health

32.     A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

33.     Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—was created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

34.     EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or to funds that purport to equal or approximate a portion of their

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

35.    Defendant Brigit is a fintech company that provides an EWA product, which it calls "Instant Cash." Brigit markets its product as a cash advance, with statements like: "Need some extra cash? You've come to the right place. With Brigit Instant Cash, you can get a cash advance of $25–$250 in minutes."[20]

36.    To repay these loans, users must authorize Brigit to charge their debit card or initiate an electronic fund transfer from a bank account.[21] If Brigit attempts to collect an outstanding loan and the repayment is declined, Brigit will continue with repeated attempts to collect the debt.

37.    EWA providers advertise their products as "free" or "no interest" while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark rates.

38.    Brigit is generally paid through two types of fees: (1) expedite fees, and (2) mandatory monthly subscription payments.

39.    First, **expedite fees** (referred to by Brigit as "Express Fees") are charged to provide instant access to loan funds. For access to Instant Cash advances "within 20 minutes," Brigit charges a fee ranging from $0.99 to $3.99.

40.    The actual cost to provide customers with instant access to funds is less than $0.05.[22]

---

[20] *How to get a cash advance from Brigit*, HELLOBRIGIT.COM, https://www.hellobrigit.com/learn/how-to-get-a-cash-advance (last visited Mar. 16, 2025).

[21] *Brigit Terms of Service*, HELLOBRIGIT.COM, https://www.hellobrigit.com/terms (last visited Mar. 16, 2025).

[22] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

41. The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is generally a less-than-two-week liquidity problem.

42. Brigit's website and advertisements include numerous representations about the speed of access to funds, such as the very name of the "*Instant* Cash" product, as well as promises to deliver funds "instantly," "quickly," "ASAP," "within seconds," "when you need it," and even "in case of emergency."

43. While Express Fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, the free, non-expedited version of a Brigit cash advance takes up to three (3) days to deposit in a borrower's account. Conversely, the expedited service takes just a few minutes. This delay is problematic for Brigit's intended users, consumers living paycheck to paycheck who turn to EWA providers for the precise reason that their need for cash is urgent and cannot wait.

44. Indeed, a recent study found the average loan term for Brigit's Instant Cash loans was only 10.8 days.[23] Consumers who cannot wait eleven days to access their wages certainly will pay whatever fees an EWA provider charges to obtain their funds as quickly as possible. As a result, the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[24]

---

https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

[23] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024) (hereinafter "*Not Free*").

[24] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. *Not Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers using employer-integrated EWA providers were for expedite fees. Consumer Financial Protection Bureau, Data Spotlight: Developments in the Paycheck

12

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

45.    Turning to the second type of fee, **subscription charges** are monthly fees Brigit charges its users to apply for Instant Cash advances.

46.    A "Brigit monthly subscription [is] required" to potentially access Brigit's Instant Cash product.[25] Specifically, borrowers must subscribe to either a "Plus plan" (which costs $8.99 per month) or "Premium plan" (which costs $14.99 per month). The main difference between the plans for purposes of Instant Cash advances is that Premium plan subscribers get free expedited delivery of funds while Plus plan subscribers pay a $0.99–$3.99 Express Fee.

47.    Brigit's subscription charges have been criticized and were the subject of a Federal Trade Commission ("FTC") enforcement action in 2023.[26]

48.    Based upon an investigation, the FTC alleged "few consumers who pay the monthly membership fee are eligible to receive cash advances of up to $250, *many are not eligible to receive cash advances at all*, and those who wish to receive the immediate cash advances they were promised cannot without paying extra."[27]

49.    When properly viewing EWA products' expedite fees and subscription charges as costs of credit (*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

50.    A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:

_____

Advance Market (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.
[25]    *Brigit Instant Cash: How It Works*, HELLOBRIGIT.COM, https://www.hellobrigit.com/learn/brigit-instant-cash-how-it-works (last visited Mar. 16, 2025).
[26]    *Fed. Trade Comm'n v. Bridge IT, Inc.*, No. 1:23-cv-09651, Compl., ECF No. 1 (S.D.N.Y. Nov. 11, 2023) (hereafter "FTC Compl.").
[27]    *Id.* ¶ 2.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Total cost of using earned wage access products is close to that of payday loans**

The average APR for earned wage access advances is over 330%, according to 2021 data on transactions across five companies. Of the 5.8 million transactions completed by tip-based companies, 73% included tips.

*Annual Percentage Rates (APRs) help compare the total cost of borrowing money, including interest and fees:*

New car loans
7%

Credit card plans
21%

**Wage-based cash advances that don't request tips**
331%

**Wage-based cash advances that request tips**
334%

Payday loans
353%

Chart: Erica Yee, CalMatters • Source: national average APRs for new car loans and credit card accounts with finance charges (2023 Q1) from the Federal Reserve; state average APRs for earned wage access products and payday loans (2021) from the CA Dept. of Financial Protection & Innovation • Get the data • Created with Datawrapper

51.    The APR received by Brigit for its Instant Cash product is similar and *often higher*, with a study from the Center for Responsible Lending finding the average APR across thousands of Brigit Instant Cash loans amounted to **439%**.[28]

52.    Plaintiff received loans from Brigit with similar APRs. *See infra.*

53.    Ironically, Brigit and other EWA providers market their products as low-cost alternatives to payday loans.[29] In truth, Brigit is a wolf in sheep's clothing: extending loans with APRs nearly identical to the exorbitantly-priced payday loans it claims to replace.

54.    The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

55.    A CRL analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees.

---

[28] *Not Free*, *supra* note 23, at 10.

[29] *Brigit Instant Cash: How It Works*, HELLOBRIGIT.COM, https://www.hellobrigit.com/learn/brigit-instant-cash-how-it-works (last visited Mar. 16, 2025) ("[Brigit Instant Cash is ] designed to provide you with a financial safety net when you need it, without the high fees or interest rates that come with traditional payday loans.").

14

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[30] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

56.    Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[31]

### ii.    EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect

57.    While EWA products are financially disastrous for consumers, they have proven profitable for the companies selling them. They maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

58.    "Not all members [who pay Brigit subscription fees and apply for a cash advance] will qualify for advances."[32]

59.    To qualify for an Instant Cash loan, borrowers must first "link [their] primary checking account and verify [their] income."[33]

60.    To determine whether a borrower is creditworthy, and decide how much credit to extend, Brigit requires users to connect their accounts to Brigit through Plaid. Plaid is a

---

[30] Wang, Constantine, Burks, Farahi, *A Loan Shark In Your Pocket*, CENTER FOR RESPONSIBLE LENDING at 7 (Oct. 2024).
[31] *Not Free*, *supra* note 23, at 6.
[32]    *Brigit    Instant    Cash:    How    It    Works*,    HELLOBRIGIT.COM, https://www.hellobrigit.com/learn/brigit-instant-cash-how-it-works (last visited Mar. 16, 2025).
[33] *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

financial services provider that partners with Brigit and other fintech companies to allow them to view customer banking information. Plaid allows Brigit to "[q]uickly verify assets and income" of borrowers, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[34]

61.     Brigit uses its real-time insight into customer financials to ensure borrowers will have sufficient funds to repay their loans on payday (*i.e.*, in the underwriting process) and to schedule its repayment debits as soon as payday hits. In short, through Plaid, Brigit has constantly updating visibility of all transactions in connected accounts.

62.     Through its access to, and perpetual review of, borrowers' financial accounts, Brigit is continually assessing the creditworthiness of its borrowers, and the attendant risk of offering them credit. Brigit uses its so-called "Brigit score" "to determine whether or not [a borrower] qualif[ies] for Brigit Instant Cash," by evaluating financial data across three categories:

- Bank Account Health (balance status and account activity)
- Spending Behavior (budgeting habits and bill payment history) [and]
- Earnings Profile (monthly recurring deposits and deposit history)[35]

63.     Brigit's underwriting process is both rigorous and continual. Borrowers "must qualify for an [Instant Cash] Advance each time an Advance request is made[.]"[36]

64.     And qualifying for a cash advance is by no means guaranteed. According to the FTC, "approximately 20% [of Brigit users] have been denied access to cash advances

---

[34] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 13, 2025).
[35] *How to get a cash advance from Brigit*, HELLOBRIGIT.COM, https://www.hellobrigit.com/learn/how-to-get-a-cash-advance (last visited Mar. 16, 2025).
[36] *Brigit Terms of Service*, HELLOBRIGIT.COM, https://www.hellobrigit.com/terms (last visited Mar. 16, 2025).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

entirely."[37] That is, after reviewing borrowers' financials, Brigit determines 20% of its customers are not credit worthy and declines to offer them Instant Cash advance access.

65.     And for those who qualify, Brigit strictly monitors their financial health to determine how much credit the borrowers can take on and reliably repay. Brigit determines how much credit to offer its borrowers "based on [their] past need and ability to pay back comfortably."[38] Through its constant underwriting process, Brigit extends loans to borrowers only when it is confident they will repay.

66.     For borrowers that qualify, Brigit generally begins by offering relatively low amounts of Instant Cash, like $50 or $100. Borrowers obtain greater access to credit—*i.e.*, Brigit will raise their loan limit—by consistently paying off loans to Brigit on time and otherwise improving their Brigit score with positive bank account health, spending behavior, and earnings.

67.     Brigit notably restricts access to its largest loans to a select few of its borrowers. Indeed, although it widely advertises quick access to cash advances up to $250, "only approximately 1% of Brigit Plus customers have received access to $250."[39]

68.     These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[40] The only distinction—that

---

[37] FTC Compl., ¶ 34.
[38] *How do I increase my advance amount?*, BRIGIT HELP CENTER, https://help.hellobrigit.com/hc/en-us/articles/360023451792-How-do-I-increase-my-advance-amount (last visited Mar. 16, 2025).
[39] FTC Compl., ¶ 34.
[40] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client

17

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

traditional lenders review credit scores and borrowers' applications to determine creditworthiness while EWA providers like Brigit directly review borrowers' financial accounts—is one without a difference.

69.     In addition to these rigorous loan qualification procedures, Brigit requires its borrowers to pre-authorize Brigit to debit their chosen payment method on the scheduled repayment date.[41]

70.     "Brigit aligns the repayment with [borrowers'] incoming paycheck, making sure the funds will be available."[42]

71.     If a pre-authorized payment fails or is declined, Brigit will make multiple additional attempts to collect the outstanding loan.

72.     Borrowers must pay off their outstanding Instant Cash loans before requesting another.

73.     In sum, Brigit's underwriting process requires, before any money changes hands, that borrowers: (1) sign up to a "Plus" or "Premium" subscription plan and be up to date on monthly subscription charges; (2) demonstrate they are employed and regularly paid through that employment; (3) link the bank account[43] to which paychecks are deposited to

---

pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

[41] *Brigit Instant Cash: How It Works*, HELLOBRIGIT.COM, https://www.hellobrigit.com/learn/brigit-instant-cash-how-it-works (last visited Mar. 16, 2025) ("When you take out an advance, you agree to a repayment date—usually your next payday (but you can choose a different day if you want). Brigit will automatically withdraw the amount you borrowed from your bank account on the due date.").

[42] *Id.*

[43] Borrowers' bank accounts must be at least two months old to qualify.

18

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Brigit's app through Plaid; (4) be paid at least $1,500 per month to their connected bank account; (5) connect at least one method of repayment; and (6) authorize Brigit to automatically debit the linked accounts in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees. Borrowers who fail to complete these steps cannot obtain cash advances.

74.     Additionally, if a borrower is unable to repay a loan, Brigit prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid.

75.     Through these underwriting procedures and policies, Brigit ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's employer deposits the borrower's next paycheck.

76.     These debt collection methods are so successful that lenders recoup their advances at least 97% of the time using these tactics.[44]

**b.  Brigit's Loans to Plaintiff**

77.     Plaintiff CPO Feeman is currently an active servicemember in the U.S. Navy stationed at Fort Bragg in Cumberland County, North Carolina.

78.     He has been an active duty servicemember since 2009 and will remain on active duty until at least 2028.

79.     Brigit extended consumer credit to Plaintiff in the form of Instant Cash loan transactions like those discussed above.

_____

[44] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

80. CPO Feeman used the loans from Brigit for personal, family, or household purposes.

81. CPO Feeman paid Brigit's finance charges, in the form of Express Fees and subscription charges, to obtain cash-advance loans.

82. A small selection of Instant Cash loans made by Brigit to CPO Feeman are shown in the below table, with the estimated cost of credit and MAPR included:

*Table 1*

| Date Loan Period | Principal Amount | Express Fee | Subscription Fee | APR |
|---|---|---|---|---|
| 5/16/24–5/29/24 (13 days) | $95.00 | $1.99 | $8.99 May 2024 | 325% |
| 3/18/24–4/12/24 (25 days) | $95.00 | $1.99 | $8.99 March 2024 | 169% |
| 1/16/24–1/29/24 (13 days) | $95.00 | $1.99 | $8.99 March 2024 | 325% |

83. Under the MLA, the subscription fees that are necessary in order to be eligible for Instant Cash loans must be included in the MAPR. But even if the subscription fees were excluded from the MAPR calculation, most of Defendant's loans would still exceed the MLA's 36% cap. For instance, the January and May loans above would each have an MAPR of 58.8% if only the Express Fees were considered finance charges.

84. CPO Feeman has received many usurious loans from Brigit since he began using the service.

85. The Express Fees and subscription charges are immediately and directly connected to Brigit's extensions of credit to Plaintiff.

86. Further, Brigit's credit agreement required CPO Feeman to purportedly waive his right to a jury trial and waive his right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

87. Brigit's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

### c. Brigit Violates the MLA and the TILA

88. The MLA prohibits a creditor from obligating a "Covered Member" to a loan that exceeds 36% MAPR. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes "finance charges associated with the consumer credit." 32 C.F.R. § 232.4.

89. A "Covered Member" under the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

90. CPO Feeman and the MLA Class Members are subject to the protections and limitations imposed by the MLA. The MLA protects any consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

91. CPO Feeman is a Covered Borrower with respect to his loan agreements with Brigit because he took out the loan while an active-duty service member for personal, family or household purposes.

92. Brigit is a "creditor" subject to the requirements and limitations imposed by the MLA because it engages in the business of extending consumer credit to Covered Borrowers. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

93. The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Borrower primarily for personal, family, or household

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

purposes," subject to a finance charge and not subject to any statutory exception. 32 C.F.R. § 232.3(f)(1)(i); 10 U.S.C. § 987(i)(6).

94.     Brigit violates the MLA in at least four distinct ways: By (1) charging interest above the 36% statutory MAPR rate cap; (2) failing to provide any required MLA Disclosures; (3) including a class action and jury trial waiver, which is prohibited by the MLA; and (4) including a mandatory binding arbitration clause. See, 10 U.S.C. § 987(b), (c), (e)(2), (e)(6)– (7).

95.     As a result of Brigit's failure to provide substantially any of the disclosures required by TILA, Brigit also violates 15 U.S.C. § 1638.

## VI.     TOLLING

96.     The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. §§ 3901 et seq., tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to CPO Feeman, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## VII.     CLASS ALLEGATIONS

97.     CPO Feeman seeks to represent two classes of individuals pursuant to NY CPLR § 901 (2015), *et seq.*

98.     CPO Feeman seeks to represent the "MLA Class" and the "TILA Class" (collectively the "Classes"). CPO Feeman brings this action individually and on behalf of classes of which he is a member and initially defined:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with Brigit to use its "Instant Cash" product, in which Brigit was paid a finance charge (including, without limitation, an expedited transfer (Express) fee or subscription charge).

**TILA Class**: All individuals in the United States that entered into an agreement with Brigit to use its "Instant Cash" product, in which Brigit was paid a finance charge (including, without limitation, an expedited transfer (Express) fee or subscription charge).

99.     Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Brigit and any entity in which Brigit has a controlling interest, or which has a controlling interest in Brigit, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

100.     CPO Feeman reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

101.     **Numerosity**. Brigit's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable.

102.     The exact number of Class members is unknown, but Brigit has made millions of loans, and CPO Feeman estimates there are, at least many thousands of consumers in the MLA Class and TILA Class as Brigit has issued thousands of loans to members of the Classes in a manner that violates the MLA and TILA.

103.     **Commonality**. Common questions of law and fact affect the right of each Class member and common relief by way of damages is sought for CPO Feeman and Class members.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

104. The harm that Brigit has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

    a. Whether CPO Feeman and the MLA Class members are Covered Borrowers subject to the protections and limitations of the MLA;

    b. Whether Brigit is a "creditor" subject to the protections and limitations of the MLA;

    c. Whether Brigit's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

    d. Whether Brigit entered into standard form loan agreements with Covered Borrowers;

    e. Whether Brigit's loans exceed the MLA statutory rate cap of 36% MAPR;

    f. Whether Brigit failed to provide required MLA disclosure in violation of the MLA;

    g. Whether Brigit's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

    h. Whether Brigit's standard form loan agreements contain an arbitration clause in violation of the MLA;

    i. Whether Brigit failed to provide required credit disclosures in violation of the MLA and TILA;

    j. Whether each month Brigit charged interest to CPO Feeman and Class Members it restarted the statute of limitations under the MLA;

    k. Whether each month that CPO Feeman and the Class Members paid money to Brigit it restarted the statute of limitations under the MLA;

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1     Case 1:25-cv-03806-LJL    Document 1-1    Filed 05/07/25    Page 28 of 33    RECEIVED NYSCEF: 03/20/2025

l.  Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

m.  Whether Brigit should be enjoined from continuing its lending practices in the manner challenged herein;

n.  Whether Brigit is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which CPO Feeman and the Class are entitled under 10 U.S.C. § 987(f)(5); and

o.  Any declaratory and/or injunctive relief to which the Classes are entitled.

105.  **Typicality**. The claims and defenses of CPO Feeman are typical of the claims and defenses of the MLA Class because CPO Feeman is a Covered Borrower and his loan agreements with Brigit are typical of the type of personal, household, or family loans that Brigit normally provides to Covered Borrowers. Additionally, Brigit uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. CPO Feeman suffered damages of the same type and in the same manner as the Classes he seeks to represent. There is nothing peculiar about the Plaintiff's claims.

106.  **Adequacy**. CPO Feeman will fairly and adequately assert and protect the interests of the Classes. CPO Feeman has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and CPO Feeman has no conflict of interest that will interfere with maintenance of this class action.

107.  **Predominance**. The previously articulated common issues of fact and law predominate over any question solely affecting individual Class Members. Resolution of the common issues in this litigation will resolve virtually the entirety of every Class Members' claims in a single stroke. There are no significant individual questions of liability or damages

25

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

27 of 32

whatsoever, and certainly not ones that predominate over issues common to the Classes. Thus, predominance is established.

108.    **Superiority**. A class action provides a fair and efficient method for the adjudication of this controversy. There are no unusual legal or factual issues that would create manageability problems; Prosecution of thousands of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Brigit and could create incompatible standards of conduct;  Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and the claims of the individual Class members are small in relation to the expenses of litigation, making a class action the only procedural method of redress in which Class members can, as a practical matter, vindicate their legal claims and enforce their statutory rights.

109.    Brigit has acted and refused to act on grounds generally applicable to the Classes, thereby making declaratory relief and corresponding final injunctive relief under the California Rules of Civil Procedure appropriate with respect to the Classes. Brigit should be enjoined from making loans to Covered Borrowers in violation of the MLA and TILA and a declaration should be made that the loans are void from inception.

## VIII.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF MILITARY LENDING ACT

110.    CPO Feeman brings this claim on behalf of himself and the MLA Class, and incorporates paragraphs 1–111 by reference.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1     Case 1:25-cv-03806-LJL    Document 1-1    Filed 05/07/25    Page 30 of 33    RECEIVED NYSCEF: 03/20/2025

111. The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Borrowers") to a loan in excess of 36% MAPR.

112. A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

113. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4. The MAPR therefore includes both the Express Fees and subscription charges imposed by Brigit.

114. CPO Feeman and the MLA Class Members are "Covered Borrowers," subject to the protections and limitations imposed by the MLA. A Covered Borrower is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

115. CPO Feeman is considered a "Covered Borrower" with respect to his Brigit loan agreements because CPO Feeman is an active duty service member who is obligated by law to repay loans he took out for personal, family or household purposes.

116. Brigit is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Borrowers protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

117. The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Borrower primarily for personal, family, or household

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

118.    Brigit charged CPO Feeman and the MLA class well above the 36% interest rate cap on their loans, in violation of the MLA.

119.    Brigit fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

120.    Brigit's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

121.    Brigit's standard form loan agreements include class action waivers trial waivers in violation of 10 U.S.C. § 987(e)(2).

122.    As a result, Brigit violates 10 U.S.C. § 987.

## COUNT II
## VIOLATIONS OF THE TRUTH IN LENDING ACT

123.    CPO Feeman brings this claim on behalf of himself and the TILA Class and incorporates paragraphs 1–99 by reference.

124.    TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. Brigit's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

125.    Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

126.     Brigit is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

127.     Brigit has not provided such disclosures before consummation of the loan agreements.

128.     Brigit failed to provide such disclosures to CPO Feeman and the TILA Class.

129.     As a result, Brigit violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

### **PRAYER FOR RELIEF**

WHEREFORE, CPO Feeman prays that the Court enter an Order:

A.     Certifying this action as a class action as provided by Fed. R. Civ. P. 23, appointing CPO Feeman as Class Representative, and appointing undersigned attorneys and their firms as Class Counsel;

B.     Declaring that Brigit violated the MLA and adjudging that CPO Feeman and MLA Class Members' standard form loan agreements violate the MLA;

C.     Adjudging that Brigit violated the MLA and awarding CPO Feeman and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

D.     Adjudging that Brigit violated TILA and awarding CPO Feeman and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

E.     Adjudging that Brigit violated the MLA and award CPO Feeman and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

F.     Awarding CPO Feeman and the Classes, reasonable attorneys' fees and costs incurred in this action;

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 1                                                                RECEIVED NYSCEF: 03/20/2025

Case 1:25-cv-03806-LJL    Document 1-1    Filed 05/07/25    Page 33 of 33

G.  Enjoining Brigit from continuing to engage in predatory lending practices in violation of the MLA and TILA;

H.  Awarding CPO Feeman, and the MLA Class, any pre-judgment and post-judgment interest as may be allowed under the law; and

I.  Awarding such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMAND</u>

CPO Feeman demands a jury trial on all issues so triable.

Dated: March 20, 2025                    Respectfully submitted,

By: */s/ Thomas M. Mullaney*

THE LAW OFFICE OF THOMAS M. MULLANEY
Thomas M. Mullaney
530 Fifth Avenue
23rd Floor
New York, NY 10036
Telephone: (212) 223-0800
Email: tmm@mullaw.org

CARNEY BATES & PULLIAM, PLLC
Randall K. Pulliam (*pro hac vice* forthcoming)
Edwin Lee Lowther III (*pro hac vice* forthcoming)
Courtney Ross Brown (*pro hac vice* forthcoming)
One Allied Drive, Suite 1400
Little Rock, AR, 72202
Telephone: (501) 312-8500
Email: rpulliam@cbplaw.com
Email: llowther@cbplaw.com
Email: cbrown@cbplaw.com

JACOBSON PHILLIPS PLLC
Jacob L. Phillips (*pro hac vice* forthcoming)
Joshua R. Jacobson (*pro hac vice* forthcoming)
478 E. Altamonte Dr.
Ste 108-570
Altamonte Springs, FL 32701
Telephone: (407) 720-4057
Email: jacob@jacobsonphillips.com
Email: joshua@jacobsonphillips.com

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.