**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT FEEMAN, GUSTAVO GILLY, and MICHAEL COLLINS, individually, and on behalf of all others similarly situated | |
| **Plaintiffs,** | CASE NO.: 1:25-cv-03806-LJL-RWL |
| **v.** | **CLASS ACTION** |
| BRIDGE IT, INC., d/b/a BRIGIT, | **DEMAND FOR JURY  TRIAL** |
| **Defendant.** | |

<u>**AMENDED CLASS ACTION COMPLAINT**</u>

Plaintiffs, Robert Feeman, a Chief Petty Officer in the United States Navy ("CPO Feeman"), Gustavo Gilly, a Specialist in the United States Army ("SPC Gilly"), and Michael Collins, a Petty Officer in the United States Navy ("PO Collins") (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to themselves and upon information and belief and the investigation of their counsel as to all other matters, and bring this Amended Class Action Complaint against Bridge IT, Inc. (D/B/A Brigit) (hereafter, "Brigit" or "Defendant") and allege as follows:

## I.     NATURE OF THE ACTION

1.     This Amended Complaint seeks to protect active-duty military service members, Illinois residents, and Georgia residents from Brigit's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA"), the Truth in Lending

1

Act, 15 U.S.C. § 1638 ("TILA"), the Georgia Payday Loan Act ("PLA"), O.C.G.A. § 16-17-2, *et seq.*, and the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-5-5, *et seq.* ("PLPA").

2.     Brigit is in the business of payday lending through an earned wage access ("EWA") product, which makes funds available to its customers who repay Brigit principal and finance charges (including expedite fees and monthly subscription charges) on payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as having "no interest," in practice, Brigit as a matter of course takes in *triple*—and sometimes *quadruple*—digit finance charges from its borrower customers.

3.     A recent study analyzed thousands of short-term loans from Brigit and found the average annual percentage rate ("APR") for Brigit's loans was **439%**. Defendant issued Plaintiffs many of these predatory instant cash loans, with several drastically exceeding even that average and one exceeding **1,600%** military APR. *See infra*. The end result is a financial product that extracts exorbitant fees from workers, encourages serial usage and dependance on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

4.     CPO Feeman, SPC Gilly, and PO Collins have each used Brigit's "Instant Cash" product for more than a year. By virtue of, *inter alia*, the sky-high fees charged for these cash advance loans, Brigit has extended consumer credit to Plaintiffs on numerous occasions in violation of the MLA, TILA, PLA, and PLPA.

5.     Borrowing money that is repaid on payday is not an innovation: it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products can trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendant's "Instant Cash" transactions are in reality extensions of consumer credit.

6.      The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Borrowers") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, Brigit makes no effort to fulfill its duty to determine whether it is lending to Covered Borrowers or to provide legally mandated protections for them.

7.      In violation of the MLA, Defendant uses its Instant Cash product to saddle Covered Members with charges that yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

8.      Brigit's consumer credit agreements violate the MLA in at least five ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any required MLA Disclosures; (3) including a class action and jury trial waiver; (4) including a mandatory binding arbitration clause; and (5) using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. § 987(b), (c) & (e)(1)(2)(5)(6).

9.      And despite Georgia and Illinois statutorily outlawing payday lending, Defendant has offered its short-term, high-cost cash-advance product to Georgia and Illinois consumers for years. In violation of both states' laws, Defendant has used its product to extract charges from consumers that yield annual percentage rates ("APRs") drastically exceeding the applicable legal limits.

10.      Brigit systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

11.     Among the abusive lending practices the MLA was designed to curb was predatory payday loans made to servicemembers.[1] The Department of Defense ("DoD") highlighted how predatory lending practices affected military members in a report about the egregious lending practices in the payday lending industry ("the Report").[2] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million annually in abusive fees as of 2005.[4]

12.     Brigit's business practices violate the MLA, TILA, PLA, and PLPA and are part of a systematic nationwide policy and practice. CPO Feeman, SPC Gilly, and PO Collins seek to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## II.     PARTIES

13.     Plaintiff, CPO Feeman, is an individual over 18 years of age. At all times relevant, CPO Feeman was a natural person and resident of North Carolina. He has been a member of the U.S. Navy since 2008 and is a currently a chief petty officer stationed at Fort Bragg in North Carolina.

14.     During the class period, CPO Feeman was a Covered Borrower and an active-duty service member employed by the U.S. Navy.

---

[1] U.S. DEP'T OF DEF., REPORT ON PREDATORY LENDING PRACTICES DIRECTED AT MEMBERS OF THE ARMED FORCES AND THEIR DEPENDENTS, (Aug. 9, 2006), https://apps.dtic.mil/sti/pdfs/ADA521462.pdf [hereinafter REPORT].
[2] Id. at 10–16.
[3] Id. at 10–11.
[4] Id. at 11.

15.     Plaintiff, SPC Gilly, is an individual, over 18 years of age. At all times relevant, SPC Gilly was a natural person and resident of Georgia. He has been a member of the U.S. Army since 2008 and is currently a Specialist stationed at Fort Stewart in Georgia.

16.     During the class period, SPC Gilly was a Covered Borrower and an active-duty service member employed by the U.S. Army

17.     Plaintiff, PO Collins, is an individual over 18 years of age. At all times relevant, PO Collins was a natural person and resident of Illinois. He has been a member of the U.S. Navy since 2015 and is currently a Petty Officer stationed at Naval Station Great Lakes in Illinois.

18.     During the class period, PO Collins was a Covered Borrower and an active-duty service member employed by the U.S. Navy.

19.     Defendant Bridge IT, Inc. (doing business as "Brigit") is a Delaware corporation with its principal place of business at 36 West 20th Street, Floor 11, New York, NY 10011.  Brigit transacts or has transacted business in this District and throughout the United States. Through its digital-technology platform, including its website and mobile app, Brigit has offered, brokered, and extended online installment loans, engaged in the servicing and collections of such loans, and provided other financial products and services to consumers, as described below.

20.     Brigit has offered loan agreements to consumers, including Covered Borrowers, since at least 2019, entering into millions of credit transactions.

### III.    JURISDICTION AND VENUE

21.      This court has federal question jurisdiction under 28 U.S.C. § 1331. Plaintiffs' Amended Complaint alleges two federal claims under the MLA and TILA. Under the MLA, "[a]n action for civil liability . . . may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction."

10 U.S.C. § 987. Under the TILA, "any action … may be brought in any United States district court, or in any other court of competent jurisdiction." 15 U.S.C. § 1640(e).

22.     The Court has supplemental jurisdiction over the PLA and PLPA claims under 28 U.S.C. § 1367(a) because each claim is "so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy."

23.     In the alternative, this Court has jurisdiction over the PLA and PLPA claims pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d) because: (a) this is a class action within the meaning of Rule 23 of the Federal Rules of Civil Procedure; (b) the proposed Illinois and Georgia Class each consist of at least 100 members; (c) at least one member of the proposed Illinois and Georgia Class is a citizen of a state different from Brigit; and (d) the amount in controversy as to both the proposed Illinois and Georgia Class exceeds $5,000,000, exclusive of interest and costs, aggregating the claims of all class members.

24.     This Court has personal jurisdiction over Defendant because Defendant conducts business in this State and keeps its headquarters in New York, New York.

25.     Additionally, in the terms of service for Brigit's Instant Cash, Brigit consents to exclusive jurisdiction in the state and federal courts in New York, New York. Jurisdiction and venue are therefore proper in this Court.

## IV.     LEGAL BACKGROUND

### a.  The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered Members

26.     The DoD's Report on lending practices discussed the payday lending industry at length.[5] The Report noted that payday lenders were "heavily concentrated around military

---

[5] *See generally, id.*

bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[6]

27.    Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[7] Moreover, the military payment architecture and the Uniform Code of Military Justice to which servicemembers are bound make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[8]

28.    Similarly, the "military culture emphasizes financial responsibility, with basic policy explicitly stating that Service members are to pay their just debts."[9]

29.    While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[10] Those loans, like Brigit's, "are delivered and collected online through electronic fund transfer." [11]

---

[6] *Id.* at 10–11.
[7] *Id.* at 11.
[8] *Id.* at 14. To be sure, EWA providers like Brigit do not collect physical checks from their customers at loan initiation but instead takes a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.
[9] *Id.* at 10.
[10] *Id.* at 15.
[11] *Id.* at 16.

30.     The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate Brigit's business model:

> (1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit.  These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.
>
> (2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[12]
>
> (3) . . . Increasingly the Internet is used to promote loans to Service members.
>
> (4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.
>
> . . .
>
> (6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[13]

31.     The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[14] As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging

---

[12] *Id.* at 21–22. To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.
[13] *Id.* at 21–22.
[14] *Id.* at 39.

from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[15]

32.    Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[16]

33.    To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[17]

34.    The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb predatory loan practices harming Service members. Military and veteran organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and lawmakers also supported the requested legislation.

35.    Congress answered the call and passed the MLA to protect Covered Borrowers from unfair, deceptive, and excessively priced loans.

b. **The Military Lending Act**

36.    In the wake of the DoD's investigations, Congress enacted the Military Lending Act, 10 U.S.C. § 987 *et seq.*, in 2006.

---

[15] *Id.* at 41–42.
[16] *Id.* at 46.
[17] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

37.    The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

38.    The MLA also requires mandatory disclosures in "consumer credit" [18] transactions with Covered Borrowers, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

39.    Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that requires the Covered Borrow to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

40.    The MLA also prohibits lenders from using check or other method of access to a deposit, savings, or other financial account maintained by the borrower as security for an obligation.

**c.  The Truth in Lending Act**

41.    The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory

---

[18] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

42.    Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those Brigit offers here. Brigit fails to make any of the following required disclosures:

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *id.* at § 1638(2)(B);

-  "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

- "The finance charge expressed as an 'annual percentage rate', using that term," *id.* at § 1638(4);

- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *id.* at § 1638(6);

- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *id.* at § 1638(8);

- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *id.* at § 1638(9);

- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *id.* at § 1638(11); and

11

- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *id.* at § 1638(12).

### d. The Georgia Payday Loan Act

43.    Payday lending involves offering short-term loans, often for small amounts, with repayment expected on the borrower's next payday. These loans are frequently marketed as a quick solution for bridging financial gaps between paychecks.

44.    Payday loans are not a new invention: they have been offered for decades. While they have taken many forms, one of the unifying characteristics of payday lending has been that lenders have created different artifices, evolving contractual arrangements, and inventive structures to evade usury caps for such loans.

45.    In the past, lenders operating in Georgia and elsewhere disguised payday loans as "wage buying," where lenders claimed to be purchasing earned wages, although in reality they were simply issuing loans at usurious rates.

46.    Georgia's first major legislative enactment aimed at stopping payday lending was the Industrial Loan Act ("ILA"). The legislation was passed because short-term, high-cost loans trap consumers in a cycle of debt. The cycle perpetuates itself because fees charged in conjunction with payday loans reduce borrowers' paychecks and net pay each period, necessitating borrowers to obtain new loans to cover the shortfall created by the original loans.

47.    Notwithstanding the ILA, payday lending made a resurgence in the late 1990s and 2000s in newly structured transactions, such as deferred presentments, in which the lender advanced money in exchange for a postdated check that it agreed not to cash until a specified future date (typically the borrower's next payday).

48.     In response to the scourge of "short-term cash advances" making a comeback in Georgia, the Attorney General issued Official Opinion 2002-3 that addressed the practices of "many lenders" who had "developed schemes intended to disguise the true character of the payday loan transaction." The Attorney General observed that "Payday loans have been recognized by many courts, in Georgia and elsewhere, as a pretext for usury" and warned that the then-novel disguised payday loans were illegal under Georgia law.

49.     Notwithstanding the ILA and Attorney General opinion condemning disguised payday lending, payday lending persisted in the state. To stop these evasions, in 2004, Georgia enacted the Payday Lending Act ("PLA").

50.     The PLA "encompasses all transactions in which funds are advanced to be repaid at a later date, notwithstanding the fact that the transaction contains one or more other elements." O.C.G.A. § 16-17-1(a). The PLA prohibits lenders from collecting any amounts on payday loans, deems payday loans void and unenforceable, and subjects payday lenders to liability for statutory damages in an amount equal to three times any charges made on an illegal payday loan, *id.* § 16-17-3.

51.     As history teaches, payday lending is simply too profitable an enterprise for some lenders to resist. EWA products represent the newest generation artifice to attempt to evade Georgia usury law and bilk consumers through a short-term, high-cost payday loan product.

52.     EWA providers' cash-advance loan products (including Brigit's) offer cash to borrowers in return for the authorization to debit the borrower's bank account on their payday in an amount equal to the principal cash-advance loan amount and any additional charges.

53.     Defendant's Instant Cash product falls within the scope of the PLA because it is a "transaction[] in which funds are advanced to be repaid at a later date." O.C.G.A. § 16-17-1(a).

13

e. **The Illinois Predatory Loan Prevention Act**

54. Before 2021, Illinois law permitted payday lenders to charge triple-digit annual percentage rates (APRs)—often 300% or more—on small-dollar, short-term loans.

55. Myriad studies showed that the vast majority of payday lending in Illinois came from repeat borrowers. The high-fee, short-term nature of payday loans traps users in a cycle of debt, perpetuating the ever-growing need for additional borrowing and associated fees.

56. Despite prior regulatory efforts, payday lending remained a significant source of economic harm and societal inequity, prompting legislative action to address these systemic issues. By the time the PLPA was enacted, the public and legislative consensus had grown that the payday lending model—high fees, short terms, and repeat borrowing—was structurally predatory and disproportionately harmful to vulnerable people and communities.

57. The Illinois Predatory Loan Prevention Act, signed into law in March 2021, represents a landmark reform aimed at eradicating predatory payday lending in the state.

58. The PLPA established a clear 36% APR cap on all consumer loans, including payday, auto title, and installment loans.

59. The PLPA is broad in scope and expressly prohibits evasion of its mandates. That is, the PLPA states, "No person or entity may engage in any device, subterfuge, or pretense to evade the requirements of this Act, including, but not limited to" "disguis[ing]" loans as non-loan transactions.

60. Additionally, the PLPA contains a provision that expressly forbids a waiver of "any provision" of the Act.

61. The PLPA was expressly modeled after the Military Lending Act. Indeed, 815 ILCS 123/15-1-5 states the "purpose of th[e PLPA] is to protect consumers from predatory loans consistent with federal law and the Military Lending Act[.]"

62. A press release from the governor's office noted: "While the existing federal

14

law [*i.e.*, the MLA] already protects active-duty military with a 36 percent APR cap, this legislation would extend the same protection to Illinois veterans and all other consumers."[19]

63.     The same press release emphasized "Illinois families pay over $500 million per year in payday and title loan fees, which is the fourth highest in the nation," and that the PLPA would serve the righteous purpose of "provid[ing] families with more economic stability."[20]

64.     The PLPA applies to "loans," which it defines broadly to mean "money or credit provided to a consumer in exchange for the consumer's agreement to a certain set of terms, including, but not limited to, any finance charges, interest, or other conditions." 815 ILCS 123/15-1-10. The definition includes both closed-end and open-end credit agreements and "any transaction conducted via any medium whatsoever." *Id.*

65.     The PLPA delegates the authority to draft, adopt, and enforce administrative rules ensuring that lenders comply with the act to the Illinois Department of Financial and Professional Regulation (the "DFPR").

66.     When the PLPA was enacted, the DFPR issued a press release noting the "PLPA covers many types of consumer loans, which include . . . ***wage advance products***" like Brigit's Instant Cash product.[21]

67.     A violation of the PLPA "constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act." 815 ILCS 123/15-10-5(b).

## V.    FACTS

### a.  The Earned Wage Product Market and Brigit

#### i.    EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health

---

[19] Press Release, Ill. Dep't of Fin. & Prof. Reg., Gov. Pritzker Signs Equity-Centric Legislation Expanding Economic Access and Opportunity Across Illinois, (Mar. 23, 2021), https://idfpr.illinois.gov/content/dam/soi/en/web/idfpr/news/2021/2021-03-23-predatory-loan-prevention-and-cra.pdf.
[20] *Id.*
[21] *See IDFPR Releases Consumer Frequently Asked Questions About the Predatory Loan Prevention Act*, Ill. Dep't Fin. & Prof. Reg'n (Apr. 30, 2021), attached hereto as Exhibit 1.

68.    A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

69.    Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—was created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

70.    EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

71.    Defendant Brigit is a company that provides an EWA product, which it calls "Instant Cash." Brigit markets its product as a cash advance with statements like: "Need some extra cash? You've come to the right place. With Brigit Instant Cash, you can get a cash advance of $25–$250 in minutes."[22]

72.    To repay these loans, users must authorize Brigit to charge their debit card or initiate an electronic fund transfer from a bank account. If Brigit attempts to collect an outstanding loan and the repayment is declined, Brigit will continue with repeated attempts to collect the debt.

---

[22] *How To Get a Cash Advance From Brigit*, BRIGIT, https://www.hellobrigit.com/learn/how-to-get-a-cash-advance (last visited Mar. 16, 2025).

16

73.    Brigit advertises its product as "free," "no interest," and low cost while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark rates.

74.    Brigit is generally paid through two types of fees: (1) expedite fees, and (2) mandatory monthly subscription payments.

75.    First, Brigit charges **expedite fees** (referred to by Brigit as "Express Fees") to provide instant access to loan funds. For access to Instant Cash advances "within 20 minutes," Brigit charges a fee ranging from $0.99 to $3.99.

76.    The actual cost to provide customers with instant access to funds is less than $0.05.[23]

77.    The speed of access to funds is an essential and defining aspect of Brigit's Instant Cash product. It is designed to address—and marketed as addressing—what is generally a less-than-two-week liquidity problem.

78.    Brigit's website and advertisements include numerous representations about the speed of access to funds, such as the very name of the "*Instant* Cash" product, as well as promises to deliver funds "instantly," "quickly," "ASAP," "within seconds," "when you need it," and even "in case of emergency."

79.    While Express Fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, the free, non-expedited version of a Brigit cash advance takes up to three (3) days to deposit in a borrower's account. Conversely, the expedited service takes just a few minutes. This delay is problematic for Brigit's intended users: consumers living paycheck to paycheck

---

[23] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE, https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf (last visited Jun. 27, 2025) (showing cost of RTP instant credit transfer at $0.045).

who turn to EWA providers for the precise reason that their need for cash is urgent and cannot wait.

80.    Indeed, a recent study found the average loan term for Brigit's Instant Cash loans was only 10.8 days.[24] Consumers who cannot wait ten days to access their wages certainly will pay whatever fees an EWA provider charges to obtain their funds as quickly as possible. As a result, the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[25]

81.    Turning to the second type of fee, **subscription charges** are monthly fees Brigit charges its users to apply for Instant Cash advances.

82.    A "Brigit monthly subscription [is] required" to access Brigit's Instant Cash product.[26] Specifically, borrowers must subscribe to either a "Plus plan" (which costs $8.99 per month) or "Premium plan" (which costs $14.99 per month). The main difference between the plans for purposes of Instant Cash advances is that Premium plan subscribers get free expedited delivery of funds while Plus plan subscribers pay a $0.99–$3.99 Express Fee.

83.    Brigit forces users that sign up to its service through its app to agree to a monthly subscription to gain access to the Instant Cash loan product.

84.    Brigit does not allow users to obtain a loan without first enrolling in the automatically recurring charges. Brigit continues to charge users this unavoidable fee each month unless the user takes affirmative action to cancel it.

---

[24] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024) [hereinafter "*Not Free*"].
[25] *Id.* One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. *Not Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers using employer-integrated EWA providers were for expedite fees. CONSUMER FIN. PROT. BUREAU, DATA SPOTLIGHT: DEVELOPMENTS IN THE PAYCHECK ADVANCE MARKET, (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.
[26] *See supra* note 22.

85.    There is no mechanism available through the Brigit app to sign up for Instant Cash loans without first agreeing to monthly subscription charges.

86.    Brigit's subscription charges have been criticized and were the subject of a Federal Trade Commission ("FTC") enforcement action in 2023.[27]

87.    Based upon an investigation, the FTC alleged "few consumers who pay the monthly membership fee are eligible to receive cash advances of up to $250, *many are not eligible to receive cash advances at all*, and those who wish to receive the immediate cash advances they were promised cannot without paying extra."[28]

88.    When properly viewing EWA products' expedite fees and subscription charges as costs of credit (*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

89.    A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:



**Total cost of using earned wage access products is close to that of payday loans**

The average APR for earned wage access advances is over 330%, according to 2021 data on transactions across five companies. Of the 5.8 million transactions completed by tip-based companies, 73% included tips.

*Annual Percentage Rates (APRs) help compare the total cost of borrowing money, including interest and fees:*

New car loans
7%
Credit card plans
21%
Wage-based cash advances that don't request tips
331%
Wage-based cash advances that request tips
334%
Payday loans
353%

Chart: Erica Yee, CalMatters • Source: national average APRs for new car loans and credit card accounts with finance charges (2023 Q1) from the Federal Reserve; state average APRs for earned wage access products and payday loans (2021) from the CA Dept. of Financial Protection & Innovation • Get the data • Created with Datawrapper

---

[27] Complaint, *Fed. Trade Comm'n v. Bridge IT, Inc.*, 2023 WL 7556518 (S.D.N.Y. Nov. 11, 2023) No. 1:23-cv-09651, [hereinafter FTC Compl.].
[28] *Id.* at ¶ 2.

90.     Brigit receives a *substantially higher* APR for its Instant Cash Product. A study from the Center for Responsible Lending found the average APR across thousands of Brigit Instant Cash loans amounted to **439%**.[29] As discussed *infra*, Brigit made loans to Plaintiffs with APRs dramatically higher than that and exceeding the MLA, PLA and PLPA usury limits as a matter of course.

91.     Ironically, Brigit and other EWA providers market their products as low-cost alternatives to payday loans.[30] In truth, Brigit is a wolf in sheep's clothing: extending loans with APRs nearly identical to—if not higher than—the exorbitantly-priced payday loans it claims to replace.

92.     The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

93.     A CRL analysis found consumers who used EWA products took out advances repeatedly with many taking advances on the same day or the day after repayment and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[31] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

---

[29] *Not Free*, *supra* note 23, at 10.
[30]     *Beware of Instant Payday Loans and Fast Cash Loans*, BRIGIT (Aug. 1, 2019), https://www.hellobrigit.com/learn/beware-instant-payday-loans-fast-cash-loans; *Brigit Instant Cash: How It Works*, BRIGIT, https://www.hellobrigit.com/learn/brigit-instant-cash-how-it-works (last visited Mar. 16, 2025) ("[Brigit Instant Cash is ] designed to provide you with a financial safety net when you need it, without the high fees or interest rates that come with traditional payday loans.").
[31] Wang, et al., *A Loan Shark In Your Pocket*, CENTER FOR RESPONSIBLE LENDING 7 (Oct. 2024) https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-ewa-loan-shark-oct2024.pdf.

94.    Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[32]

### ii.    EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Essentially Always Collect

95.    While EWA products are financially disastrous for consumers, they have proven profitable for the companies selling them. They maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

96.    Brigit discloses on its website, "Not all members [who pay Brigit subscription fees and apply for a cash advance] will qualify for advances."[33]

97.    To qualify for an Instant Cash loan, borrowers must first "link [their] primary checking account and verify [their] income." [34]

98.    To determine whether a borrower is creditworthy, and decide how much credit to extend, Brigit requires users to connect their accounts to Brigit through Plaid. Plaid is a financial services provider that partners with Brigit and other fintech companies to allow them to view customer banking information. Plaid allows Brigit to "[q]uickly verify assets and income" of borrowers, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[35]

---

[32] *Not Free*, *supra* note 23, at 6.
[33] *Brigit Instant Cash: How It Works*, BRIGIT, https://www.hellobrigit.com/learn/brigit-instant-cash-how-it-works (last visited Mar. 16, 2025).
[34] *Id.*
[35] *Plaid Solutions: Credit*, PLAID, https://plaid.com/solutions/credit/ (last visited Mar. 13, 2025).

99.    Plaid recently published a "customer success story" featuring Brigit that describes how Brigit views "robust transactions data" through Plaid to "model cash flows, evaluate creditworthiness, and facilitate speedy transfers[.]"[36]

100.    Brigit uses its real-time insight into customer financials to ensure borrowers will have sufficient funds to repay their loans on payday (through its underwriting process) and to schedule its repayment debits as soon as payday hits. In short, through Plaid, Brigit has constantly updating visibility of all transactions in connected accounts.

101.    Through its access to, and perpetual review of, borrowers' financial accounts, Brigit is continually assessing the creditworthiness of its borrowers and the attendant risk of offering them credit. Brigit uses a so-called "Brigit score" "to determine whether or not [a borrower] qualif[ies] for Brigit Instant Cash," by evaluating financial data across three categories:

- Bank Account Health (balance status and account activity)

- Spending Behavior (budgeting habits and bill payment history) [and]

- Earnings Profile (monthly recurring deposits and deposit history)[37]

102.    Brigit's underwriting process is both rigorous and continual. Borrowers "must qualify for an [Instant Cash] Advance each time an Advance request is made[.]"

103.    And qualifying for a cash advance is by no means guaranteed. According to the FTC, "approximately 20% [of Brigit users] have been denied access to cash advances entirely." [38] That is, after reviewing borrowers' financials, Brigit determines 20% of its customers are not credit worthy and declines to offer them Instant Cash advance access.

---

[36] *Customer: Brigit*, PLAID, https://plaid.com/customer-stories/brigit/ (last visited June 23, 2025).
[37] *How To Get a Cash Advance from Brigit*, BRIGIT, https://www.hellobrigit.com/learn/how-to-get-a-cash-advance (last visited Mar. 16, 2025).
[38] FTC Compl., supra note 27, at ¶ 34.

104.    And, for those who qualify, Brigit strictly monitors their financial health to determine how much credit the borrowers can take on and reliably repay. Brigit determines how much credit to offer its borrowers "based on [their] past need and ability to pay back comfortably."[39] Through its constant underwriting process, Brigit extends loans to borrowers only when it is confident they will repay.

105.    Brigit generally begins by offering relatively low amounts of Instant Cash, like $50 or $100. Borrowers obtain greater access to credit—*i.e.*, Brigit will raise their loan limit—by consistently paying off loans to Brigit on time and otherwise improving their Brigit score with positive bank account health, spending behavior, and earnings.

106.    Brigit notably restricts access to its largest loans to a select few of its borrowers. Indeed, although it widely advertises quick access to cash advances up to $250, "only approximately 1% of Brigit Plus customers have received access to $250."[40]

107.    These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[41] The only distinction—that traditional lenders review credit scores and borrowers' applications to determine creditworthiness while EWA providers like Brigit directly review borrowers' financial accounts—is one without a difference.

---

[39] *How Do I Increase My Advance Amount?*, BRIGIT, https://help.hellobrigit.com/hc/en-us/articles/360023451792-How-do-I-increase-my-advance-amount (last visited Mar. 16, 2025).

[40] FTC Compl., *supra* note 27, at ¶ 34.

[41] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, FED. RESERVE BANK OF BOSTON (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, ARMED FORCES BANK (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

108.    In addition to these rigorous loan qualification procedures, Brigit requires its borrowers to pre-authorize Brigit to debit their chosen payment method on the scheduled repayment date.[42]

109.    "Brigit aligns the repayment with [borrowers'] incoming paycheck, making sure the funds will be available."[43]

110.    If a pre-authorized payment fails or is declined, Brigit will make multiple additional attempts to collect the outstanding loan.

111.    Brigit confirms that the money it lends through its Instant Cash product is borrowed and must be paid back through, *inter alia*, representations concerning automatic repayment and that when a cash advance is taken, there is an "amount due" and "due date," as seen in the below screenshot from the Brigit app:



---

[42] *Brigit Instant Cash: How It Works*, BRIGIT, https://www.hellobrigit.com/learn/brigit-instant-cash-how-it-works (last visited Mar. 16, 2025) ("When you take out an advance, you agree to a repayment date—usually your next payday (but you can choose a different day if you want). Brigit will automatically withdraw the amount you borrowed from your bank account on the due date.").
[43] *Id.*

112. Borrowers must pay off their outstanding Instant Cash loans before requesting another.

113. In sum, Brigit's underwriting process requires, before any money changes hands, that borrowers: (1) sign up to a "Plus" or "Premium" subscription plan and be up to date on monthly subscription charges; (2) demonstrate they are employed and regularly paid through that employment; (3) link the bank account[44] to which paychecks are deposited to Brigit's app through Plaid; (4) be paid at least $1,500 per month to their connected bank account; (5) demonstrate financial health to Brigit's satisfaction based on bank account health, spending behavior, and earnings; (6) connect at least one method of repayment; and (7) authorize Brigit to automatically debit the linked accounts in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees. Borrowers who fail to complete these steps cannot obtain cash advances.

114. Additionally, if a borrower is unable to repay a loan, Brigit prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid.

115. What's more, Brigit provides no mechanism for cancelling repayment debits. Once an Instant Cash loan has been taken, the app does not allow users an option to cancel the repayment debit or disconnect their bank account from which repayment is automatically scheduled to be drawn.

116. Although Brigit claims its Instant Cash product is something other than consumer credit or lending because its terms of service say that its advances are "non-recourse," that provision—buried in Brigit's terms of service—is functionally a dead letter.

---

[44] Borrowers' bank accounts must be at least two months old to qualify.

117.    Through the above underwriting procedures and policies, Brigit ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's employer deposits the borrower's next paycheck. And it actively prevents users from cancelling repayments or disconnecting accounts from which repayments are drawn.

118.    As a result, Brigit's debt collection methods are so successful that, according to its founder and former CEO, Brigit's "default rate [is] among the lowest [of competitor companies], hence we're able to not lose money and be profitable. Our [Brigit's] default rates are about 2%."[45]

### b.  Brigit's Loans to Plaintiffs

119.    Plaintiff CPO Feeman is currently an active servicemember in the U.S. Navy stationed at Fort Bragg in Cumberland County, North Carolina.

120.    He has been an active duty servicemember since 2009 and will remain on active duty until at least 2028.

121.    Plaintiff SPC Gilly is currently an active servicemember in the U.S. Army stationed at Fort Stewart and residing in Liberty County, Georgia.

122.    He has been an active duty servicemember since 2008 and will remain on active duty until at least 2027.

123.    Plaintiff PO Collins is currently an active servicemember in the U.S. Navy stationed at Naval Station Great Lakes in Lake County, Illinois.

---

[45] Bank On It Podcast: Episode 619 Zuben Mathews from Brigit (May 30, 2024), https://bankonitpodcast.com/episode-619-zuben-mathews-from-brigit. Brigit's "default rate" is similar to that of competitor EWA firms. A 2021 analysis found that EWA firms recoup their advances "successfully at least 97% of the time." Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, FIN. HEALTH NETWORK (April 2021) at 2, https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

26

124.    He has been an active duty servicemember since 2015 and will remain on active duty until at least 2025.

125.    Brigit extended consumer credit to Plaintiffs in the form of Instant Cash loan transactions like those discussed above.

126.    CPO Feeman, SPC Gilly, and PO Collins each used the loans from Brigit for personal, family, or household purposes.

127.    CPO Feeman, SPC Gilly, and PO Collins each paid Brigit's finance charges, in the form of Express Fees and subscription charges, to obtain cash-advance loans.

128.    A small selection of Instant Cash loans made by Brigit to CPO Feeman are shown in the table below, with the estimated cost of credit and MAPR included:

*Table 1*

| Date Loan Period | Principal Amount | Express Fee | Subscription Fee | APR |
|---|---|---|---|---|
| 5/16/24–5/29/24 (13 days) | $95.00 | $1.99 | $8.99 May 2024 | 325% |
| 1/16/24–1/29/24 (13 days) | $95.00 | $1.99 | $8.99 January 2024 | 325% |

129.    A small selection of Instant Cash loans made by Brigit to SPC Gilly are shown in the table below, with the estimated cost of credit and MAPR included:

*Table 2*

| Date Loan Period | Principal Amount | Express Fee | Subscription Fee | APR |
|---|---|---|---|---|
| 4/12/24–4/27/24 (15 days) | $50.00 | $1.99 | $8.99 April 2024 | 534% |
| 6/5/24-6/14/24 (9 days) | $50.00 | $1.99 | $4.50[46] June 2024 | 526% |
| 6/22/24-6/29/24 (7 days) | $50.00 | $1.99 | $4.49 June 2024 | 676% |

---

[46] Monthly subscription fees were included in the calculation by dividing the monthly fee by the number of advances Plaintiffs took out in the month in question. *See* 32 C.F.R.§ 232.4(c)(1)(iii)(C).

130.    A small selection of Instant Cash loans made by Brigit to PO Collins are shown in the table below, with the estimated cost of credit and MAPR included:

*Table 3*

| Date Loan Period | Principal Amount | Express Fee | Subscription Fee | APR |
|---|---|---|---|---|
| 2/15/25–2/20/25 (5 days) | $50.00 | $1.99 | $8.99 | 1,603% |
| 12/21/25–12/28/25 (7 days) | $50.00 | $1.99 | $4.50 | 677% |
| 11/11/25–11/14/25 (3 days) | $50.00 | $1.99 | $1.80 | 922% |
| 10/12/25–10/18/25 (6 days) | $50.00 | $1.99 | $3.00 | 607% |

131.    Under the MLA, the subscription fees that are necessary in order to be eligible for Instant Cash loans must be included in the MAPR. But even if the subscription fees were excluded from the MAPR calculation, most of Defendant's loans would still exceed the MLA's 36% cap.

132.    CPO Feeman, SPC Gilly, and PO Collins have each received many usurious loans from Brigit since they began using the service.

133.    The Express Fees and subscription charges are immediately and directly connected to Brigit's extensions of credit to Plaintiff.

134.    Further, Brigit's credit agreements required CPO Feeman, SPC Gilly, and PO Collins to purportedly waive their right to a jury trial and waive their right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

135.    Brigit's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

## VI.    TOLLING

136.    The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. §§ 3901 *et seq.*, tolls any and all limitations or repose periods for all active-duty military members, including those

similarly situated to CPO Feeman, SPC Gilly, and PO Collins, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## VII.    CLASS ALLEGATIONS

137.    CPO Feeman, SPC Gilly, and PO Collins seek to represent four classes of individuals pursuant to Fed. R. Civ. P. 23.

138.    Plaintiffs seek to represent the "MLA Class" and "TILA Class"; PO Collins seeks to represent the "Illinois Class"; SPC Gilly seeks to represent the "Georgia Class." These classes are referred to collectively as the "Classes." CPO Feeman, SPC Gilly, and PO Collins bring this action individually and on behalf of classes of which they are a member and initially defined:

> **MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with Brigit to use its "Instant Cash" (or substantially similar) product, in which Brigit was paid a finance charge (including, without limitation, an expedited transfer (Express) fee or subscription charge).

> **TILA Class**: All Covered Members and dependents of Covered Members (under the MLA), Illinois residents, and Georgia residents that entered into an agreement with Brigit to use its "Instant Cash" (or substantially similar) product, in which Brigit was paid a finance charge (including, without limitation, an expedited transfer (Express) fee or subscription charge).

> **Illinois Class**: All Illinois residents that entered into an agreement with Brigit to use its "Instant Cash" (or substantially similar) product, in which Brigit was paid a finance charge (including, without limitation, an expedited transfer (Express) fee, or subscription charge).

> **Georgia Class**: All Georgia residents that entered into an agreement with Brigit to use its "Instant Cash" (or substantially similar) product, in which Brigit was paid a finance charge (including, without limitation, an expedited transfer (Express) fee, or subscription charge).

139.    Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Brigit and any entity in which Brigit has a controlling interest, or which has a controlling interest in Brigit, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

140.    CPO Feeman, SPC Gilly, and PO Collins reserve the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

141.    **Numerosity**. Brigit's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable.

142.    The exact number of Class members is unknown, but Brigit has made millions of loans, and CPO Feeman, SPC Gilly, and PO Collins estimate there are, at least many thousands of consumers in the MLA Class, TILA Class, Illinois Class, and Georgia Class as Brigit has issued thousands of loans to members of the Classes in a manner that violates the MLA, TILA, PLPA, and PLA.

143.    **Commonality**. Common questions of law and fact affect the right of each Class member and common relief by way of damages is sought for CPO Feeman, SPC Gilly, and PO Collins and Class members.

144.    The harm that Brigit has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

    a.   Whether CPO Feeman, SPC Gilly, and PO Collins and the MLA Class members are Covered Borrowers subject to the protections and limitations of the MLA;

b.  Whether Brigit is a "creditor" subject to the protections and limitations of the MLA;

c.  Whether Brigit's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

d.  Whether Brigit entered into standard form loan agreements with Covered Borrowers;

e.  Whether Brigit's loans exceed the MLA statutory rate cap of 36% MAPR;

f.  Whether Brigit failed to provide required MLA disclosure in violation of the MLA;

g.  Whether Brigit's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

h.  Whether Brigit's standard form loan agreements contain an arbitration clause in violation of the MLA;

i.  Whether Brigit failed to provide required credit disclosures in violation of the MLA and TILA;

j.  Whether each month Brigit charged interest to Plaintiffs and Class Members it restarted the statute of limitations under the MLA;

k.  Whether each month that Plaintiffs and the Class Members paid money to Brigit it restarted the statute of limitations under the MLA;

l.  Whether Brigit is a "lender" as that term is understood under the PLPA, 815 ILCS 123/15-1-10;

m.  Whether Brigit issued "loans" as that term is understood under the PLPA, 815 ILCS 123/15-1-10;

n.  Whether Defendant made loans (as that term is understood under O.C.G.A. § 16-17-2) to SPC Gilly and the Georgia Class;

31

o.  Whether Defendant's loans exceeded the Georgia statutory usury cap;

p.  Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

q.  Whether Brigit should be enjoined from continuing its lending practices in the manner challenged herein;

r.  Whether Brigit is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which CPO Feeman, SPC Gilly, and PO Collins and the Class are entitled under 10 U.S.C. § 987(f)(5); and

s.  Any declaratory and/or injunctive relief to which the Classes are entitled.

145.  **Typicality**. The claims and defenses of Plaintiffs are typical of the claims and defenses of the MLA Class because named Plaintiffs are Covered Borrowers and their loan agreements with Brigit are typical of the type of personal, household, or family loans that Brigit normally provides to Covered Borrowers. Additionally, Brigit uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. Plaintiffs suffered damages of the same type and in the same manner as the Classes they seek to represent. There is nothing peculiar about the Plaintiffs' claims. For similar reasons, the claims and defenses of Plaintiffs are typical of the claims and defenses of the TILA Class, the Illinois Class and the Georgia Class. Plaintiffs suffered damages of the same type and in the same manner as the Classes they seek to represent. Plaintiffs have no interests antagonistic to the interests of the other members of the Classes.

146.  **Adequacy**. Plaintiffs will fairly and adequately assert and protect the interests of the Classes. Plaintiffs have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Plaintiffs have no conflicts of interest that will interfere with maintenance of this class action.

32

147.    **<u>Predominance</u>**. The previously articulated common issues of fact and law predominate over any question solely affecting individual Class Members. Resolution of the common issues in this litigation will resolve virtually the entirety of every Class Members' claims in a single stroke. There are no significant individual questions of liability or damages whatsoever, and certainly not ones that predominate over issues common to the Classes. Thus, predominance is established.

148.    **<u>Superiority</u>**. A class action provides a fair and efficient method for the adjudication of this controversy. There are no unusual legal or factual issues that would create manageability problems; Prosecution of thousands of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Brigit and could create incompatible standards of conduct;  Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and the claims of the individual Class members are small in relation to the expenses of litigation, making a class action the only procedural method of redress in which Class members can, as a practical matter, vindicate their legal claims and enforce their statutory rights.

149.    Brigit has acted and refused to act on grounds generally applicable to the Classes, thereby making declaratory relief and corresponding final injunctive relief under the California Rules of Civil Procedure appropriate with respect to the Classes. Brigit should be enjoined from making loans to Covered Borrowers in violation of the MLA, TILA, PLA, and PLPA and a declaration should be made that the loans are void from inception.

## VIII.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF MILITARY LENDING ACT

150.   CPO Feeman, SPC Gilly, and PO Collins bring this claim on behalf of themselves and the MLA Class and incorporates paragraphs 1–149 by reference.

151.   The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Borrowers") to a loan in excess of 36% MAPR.

152.   A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

153.   "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4. The MAPR therefore includes both the Express Fees and subscription charges imposed by Brigit.

154.   CPO Feeman, SPC Gilly, PO Collins and the MLA Class Members are "Covered Borrowers," subject to the protections and limitations imposed by the MLA. A Covered Borrower is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

155.   CPO Feeman, SPC Gilly, and PO Collins are considered "Covered Borrowers" with respect to their Brigit loan agreements because CPO Feeman, SPC Gilly, and PO Collins are active-duty service members who are obligated by law to repay loans he took out for personal, family or household purposes.

156.   Brigit is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Borrowers protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

157. The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

158. Brigit charged CPO Feeman, SPC Gilly, and PO Collins and the MLA class well above the 36% interest rate cap on their loans, in violation of the MLA.

159. Brigit fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

160. Brigit's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

161. Brigit's standard form loan agreements include class action waivers trial waivers in violation of 10 U.S.C. § 987(e)(2).

162. Brigit uses a check or other method of access to a deposit, savings, or other financial account maintained by Plaintiffs as security for the obligations in violation of 10 U.S.C. § 987(e)(5).

163. As a result, Brigit violates 10 U.S.C. § 987.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT II
### VIOLATIONS OF THE TRUTH IN LENDING ACT

164. CPO Feeman, SPC Gilly, and PO Collins bring this claim on behalf of themselves and the TILA Class and incorporates paragraphs 1–149 by reference.

165. TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. Brigit's loan agreements are closed-end credit transactions because they are not open-

end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

166. Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

167. Brigit is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

168. Brigit has not provided such disclosures before consummation of the loan agreements.

169. Brigit failed to provide such disclosures to CPO Feeman, SPC Gilly, PO Collins, and the TILA Class.

170. As a result, Brigit violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT III
## VIOLATIONS OF THE GEORGIA PAYDAY LENDING ACT

171. Plaintiff Gilly re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–149 above.

172. Plaintiff Gilly brings this claim individually and on behalf of the Georgia Class.

173. Brigit is engaged in the business of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less. O.C.G.A. § 16-17-2(a), (b).

174. Brigit is not a bank or credit union and is not licensed under any Georgia law to

engage in that business.

175.    Brigit does not meet any of the statutory exceptions to the general prohibition against the making of loans of $3,000.00 or less. See O.C.G.A. § 16-17-2(a)(1)-(4).

176.    Plaintiff Gilly and the Georgia Class are borrowers residing in Georgia who obtained cash-advance loans from Brigit and paid interest and other charges in connection with those loans.

177.    Brigit advanced funds to Plaintiff Gilly to be repaid at a later date.

178.    Brigit's conduct described herein violated and continues to violate the PLA, which means that the loans of Plaintiff Gilly and the Georgia Class were void ab initio, that Brigit is barred from collecting any amounts on those loans, and that Defendant is additionally liable to Plaintiff Gilly and members of the Georgia Class for three times the amount of any interest or other charges, and attorneys' fees and costs. *See* O.C.G.A. § 16-17-3.

179.    Accordingly, Plaintiff Gilly, individually and on behalf of the Georgia Class, requests: (i) payment of all principal of any loans repaid in the last 20 years; (ii) payment of triple the amount of any fees, or other amounts repaid in the last 20 years; (iii) a declaration that Plaintiffs' and the Georgia Class members' loans are void ab initio; (iv) and an order prohibiting Defendant from attempting to debit Plaintiff Gilly's or the Georgia Class members' bank accounts to repay any cash advances.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**COUNT IV**
**VIOLATIONS OF THE ILLINOIS PREDATORY LOAN PREVENTION ACT**

180.    Plaintiff Collins re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–149 above.

181.    Plaintiff Collins brings this claim individually and on behalf of the Illinois Class.

182.    Brigit is a lender, meaning Brigit offers or makes loans to Illinois residents.

183.    Brigit issued loans to Plaintiff Collins and other Illinois residents. Brigit provided money or credit to Plaintiff and class members in exchange for the consumers' agreement to a certain set of terms, including, but not limited to, finance charges, interest, or other conditions.

184.    Plaintiff Collins and the Illinois Class are borrowers residing in Illinois who obtained cash-advance loans from Brigit and paid interest and other charges in connection with those loans.

185.    Brigit's expedite fees and subscription charges constitute finance charges for purposes of calculating the applicable APR under the PLPA.

186.    Brigit's loans to Plaintiff and the Illinois Class exceed the 36% rate cap set by the PLPA.

187.    The PLPA renders loans made in excess of the 36% APR cap null and void, and provides that the consumer is not obligated to repay any amounts paid or owed on such loans. 815 ILCS 123/15-5-10.

188.    Plaintiff Collins and members of the Illinois Class have paid unlawful fees and finance charges in connection with Brigit's loans and are entitled to relief under the PLPA.

189.    Brigit's violations of the PLPA "constitute[ ] violation[s] of the Consumer Fraud and Deceptive Business Practices Act" ("CFDBPA").

WHEREFORE, Plaintiffs pray for relief as set forth below.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter an Order:

A. Certifying this action as a class action as provided by Fed. R. Civ. P. 23, appointing Plaintiffs as Class Representatives, and appointing undersigned attorneys and their firms as Class Counsel;

B.  Declaring that Brigit violated the MLA and adjudging that Plaintiffs and MLA Class Members' standard form loan agreements violate the MLA;

C.  Adjudging that Brigit violated the MLA and awarding Plaintiffs and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

D.  Adjudging that Brigit violated TILA and awarding Plaintiffs and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

E.  Adjudging that Brigit violated the MLA and award Plaintiffs and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

F.  Awarding Plaintiffs and the Classes reasonable attorneys' fees and costs incurred in this action;

G.  Enjoining Brigit from continuing to engage in predatory lending practices in violation of the MLA, TILA, PLPA and PLA;

H.  Awarding Plaintiffs and the MLA Class, any pre-judgment and post-judgment interest as may be allowed under the law; and

I.  Awarding such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMAND

CPO Feeman, SPC Gilly, and PO Collins demand a jury trial on all issues so triable.

Dated: June 27, 2025                Respectfully submitted,

By: /s/*Joshua R. Jacobson*

THE LAW OFFICE OF THOMAS M. MULLANEY
Thomas M. Mullaney
530 Fifth Avenue
23rd Floor
New York, NY 10036
Telephone: (212) 223-0800
Email: tmm@mullaw.org

CARNEY BATES & PULLIAM, PLLC
Samuel R. Jackson
Randall K. Pulliam (*pro hac vice*)
Edwin Lee Lowther III (*pro hac vice*)
Courtney Ross Brown (*pro hac vice*)
One Allied Drive, Suite 1400
Little Rock, AR, 72202
Telephone: (501) 312-8500
Email: sjackson@cbplaw.com
Email: rpulliam@cbplaw.com
Email: llowther@cbplaw.com
Email: cbrown@cbplaw.com

JACOBSON PHILLIPS PLLC
Joshua R. Jacobson (*pro hac vice*)
2277 Lee Rd., Ste. B
Winter Park, FL 32789
Telephone: (321) 447-6461
Email: joshua@jacobsonphillips.com