UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

<table>
<tr><td>
ROBERT FEEMAN, GUSTAVO GILLY, and<br>MICHAEL COLLINS, <i>individually and on behalf of all<br>other similarly situated</i>,<br><br>        Plaintiffs,<br><br>  -v-<br><br>BRIDGE IT, INC. d/b/a BRIGIT,<br><br>        Defendant.</td>
<td>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:</td>
<td>25-cv-3806 (LJL)<br><br><u>OPINION AND ORDER</u></td></tr>
</table>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3/31/2026

------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant Bridge It, Inc. d/b/a Brigit ("Brigit" or "Defendant"), moves, pursuant to

Federal Rule of Civil Procedure 12(b)(6), to dismiss the amended complaint or, alternatively, to

compel arbitration.  Dkt. No. 31.  For the following reasons, the motion is denied.

## BACKGROUND

Brigit is a financial-technology company that offers short-term cash advances, branded as

"Instant Cash," through a mobile application.  Dkt. No. 30 ("Compl.") ¶¶ 19, 71.  The product is

intended to address the liquidity needs of those who receive payment for their labor on a

biweekly or semi-monthly cycle but who incur expenses during the course of the pay period.  *See*

*id.* ¶ 68.  Instant Cash is what is known as an earned wage advance ("EWA") product: it provides

workers, before their payday, with funds that purport to equal or approximate a portion of their

earned but unpaid wages.  *Id.* ¶¶ 2, 69–70.  Brigit markets its product with statements like: "Need

some extra cash?  You've come to the right place.  With Brigit Instant Cash, you can get a cash

advance of $25–$250 in minutes."  *Id.* ¶ 71.  Its website and advertisements promise users that

they will be able to receive funds "instantly," "quickly," "ASAP," "within seconds," "when you

need it," and "in case of emergency." *Id.* ¶ 78.  Because the questions presented in this motion

turn in significant part on the parties' agreement and on the mechanics of the product as

designed, the Court describes both in some detail.

### A.  Terms of Service

A consumer's use of the Brigit application is governed by the Brigit Terms of Service

("TOS"), which represents "a legal agreement" between the consumer and Brigit that "sets forth

the terms and conditions governing your use of and access to" the products offered by Brigit,

including Instant Cash.  Dkt. No. 33-6 ("TOS") at 2.[1]  The TOS provides that the consumer's

"USE OF AND ACCESS TO THE SERVICES ARE EXPRESSLY SUBJECT TO THESE

TERMS" and that a consumer who does "NOT AGREE TO ALL OF THE TERMS . . .

SHOULD NOT AND MAY NOT USE OR ACCESS THE SERVICES." *Id.*  By signing up for

a Brigit account and using the application, the consumer "acknowledge[s] and agree[s] that [he

or she has] read, understand[s], and agree[s] to be bound by the Terms." *Id.* at 3.

The TOS creates obligations running in both directions.  The consumer agrees, among

other things, to provide "truthful, accurate, current and complete information," including

information regarding the user's full name, email address, and mobile telephone number; to

update Brigit "as soon as possible" if any of the user's account information changes; to authorize

Brigit to "electronically debit your Payment Method for the applicable amounts, including, but

not limited to, payments of cash advances [and] any loan repayments"; to "indemnify and hold

---

[1] Citations to this docket entry use ECF pagination.  It appears that since the date of the filing of this motion, Brigit has changed the TOS as they appear on its website. *See* Brigit Terms of Service (Mar. 13, 2026), https://www.hellobrigit.com/terms (last accessed Mar. 31, 2026).  This Opinion and Order cites to the most recent version of the TOS that is contained in the record, which Brigit filed in connection with this motion and which is dated June 30, 2025. *See* Dkt. No. 33-6.  Plaintiffs do not contest the authenticity of this document or that it may be considered on the present motion.

harmless Brigit from and against any loss" arising from preauthorized withdrawals in certain circumstances; and to comply with Brigit's representations and warranties, including the warranty that the consumer "ha[s] the right to authorize [Brigit] to charge and debit [the consumer's] Bank Account or debit card . . . for payments due . . . under the Terms." *Id*. at 4, 6–7, 16. Section 15 of the TOS sets out additional "prohibited activities," the violation of which authorizes Brigit "at its sole discretion" to "take legal action and/or use other remedies." *Id.* at 18. Brigit, for its part, assumes obligations concerning the manner and timing of its debits, its response in the event of nonpayment, and its data-handling practices. *See id*. at 5–7, 10, 13.

The TOS is enforceable by both the consumer and Brigit through binding arbitration. *Id.* at 1, 20. Section 20 of the TOS provides that "any and all Disputes" between the consumer and Brigit—defined broadly to include disputes "arising from and/or relat[ing], directly or indirectly, to [the consumer's] interaction(s), experience(s) and communication(s)" with Brigit—"will be resolved by binding arbitration." *Id*. at 20–21. Both parties expressly "agree to give up the right to go to court to assert or defend claims and disputes relating to or arising out of the Terms and/or the Services." *Id.* at 1. The consumer also "waiv[es] the right to a trial by jury and to participate in a class or representative action." *Id*. at 2.

## B. Account Setup and Evaluation

To obtain an advance, a consumer must sign up for an account, link the account to their bank account, and authorize Brigit to access and retrieve the consumer's financial information, including account transaction history and balance information. *See* TOS at 3–4. Brigit then analyzes the account to determine whether the user meets its criteria for a cash advance, looking at information such as the user's average bank account balance, spending habits, and whether paychecks are coming in regularly. Compl. ¶¶ 98–103. Brigit's promotional materials indicate

that for the consumer to be eligible for an advance, the connected account should be the primary account the consumer uses daily, be active for at least 60 days, have a balance above $0, and have at least three recurring deposits from the same source, such as direct deposit from the consumer's employer. *Id.* ¶ 101; Brigit, *How To Get a Cash Advance from Brigit*, https://www.hellobrigit.com/learn/how-to-get-a-cash-advance (last accessed Mar. 31, 2026).

To determine whether a borrower is worthy of an advance, and to decide how much cash to extend, the borrower's bank account is connected to Brigit through a financial services provider named Plaid, which allows Brigit to view customer banking information and verifies the assets and income of a borrower. Compl. ¶ 98. Brigit uses a proprietary "Brigit score" to determine whether a consumer qualifies for Instant Cash and, if so, how much to advance. *Id.* ¶ 101. The Brigit score evaluates financial data across three categories: (1) bank account health; (2) spending behavior; and (3) earnings profile. *Id.* Brigit determines how much money to advance based on borrowers' "past need and ability to pay back comfortably." *Id.* ¶ 104. Brigit generally begins by offering relatively low amounts of Instant Cash, such as $50 or $100. *Id.* ¶ 105. Consumers may obtain access to higher amounts by consistently repaying Brigit on time or otherwise improving their Brigit score with positive bank account health, spending behavior, and earnings. *Id.* Brigit restricts its largest advances of $250 to a select few consumers, by some estimates only approximately 1% of borrowers. *Id.* ¶ 106.

There is no mechanism available through the Brigit app to sign up for Instant Cash advances without first agreeing to monthly subscription charges. *Id.* ¶¶ 82, 85. There are two subscription tiers: "Premium," priced at $14.99 per month, and "Plus," priced between $5.99 and $9.99 per month. TOS at 5. The main difference between the two is that Premium subscribers

are not charged expedited delivery fees as further detailed below. *See id.*; Compl. ¶ 82.[2]  The

TOS states that certain "no-cost" products "may be available . . . from time to time" and that a

user "may be able to access Advance Services for free." *Id.* at 5.  Elsewhere, it adds:

> You are not required to enroll in a Subscription in order to receive an Advance or the Credit Monitoring service.  Users that are eligible for Advances and/or Credit Monitoring may access an Advance and/or Credit Monitoring without a Subscription and without paying the Subscription Fee.  To do so, email terms1@hellobrigit.com and state that you would like an Advance and/or Credit Monitoring without subscribing to one of our Subscription plans.  You may check whether you are eligible for Advances and Credit Monitoring through the Services.

*Id.* at 12.

### C. Cash Advance Delivery and Repayment

When a user requests an advance for which they qualify, Brigit initiates a transfer of the

funds into the user's linked bank account.  *See* TOS at 9–11.  The time it takes for that advance

to arrive varies.  A standard ACH transfer takes up to three business days to post to the user's

account.  *Id.* at 11.  If, however, the user pays an "Express Fee" of between $0.99 to $3.99, the

funds are typically delivered within 20 minutes.  *Id.*; Compl. ¶ 75.  It costs Brigit less than five

cents to provide funds on an expedited basis.  Compl. ¶ 76.  The Express Fee is payable at the

time the user repays the advance.  TOS at 11.

When a user requests an advance, Brigit simultaneously schedules a repayment "due

date," usually keyed to the user's next expected payday, and the user authorizes Brigit to debit

the advanced amount from the same account on that date.  Compl. ¶ 108 & n.42; TOS at 6, 10.

The app displays the advance amount, the scheduled repayment date, and the amount that will be

debited together on one screen.  *See* Compl. ¶ 111.  The TOS describes the repayment mechanics

---

[2] Both subscriptions also provide users "access to advanced analytical & budgeting tools, credit monitoring and identity theft insurance."  TOS at 5.  Brigit Premium also provides access to a product called Credit Builder.  *Id.*

in detail.  Section 7.6.1 provides that if the user receives an advance, "Brigit will charge your

Payment Method in accordance with the Credit and Debit Authorization."  TOS at 10.  Brigit

debits the consumer's account "any time after the later of: (a) the due-date displayed to you

through the Services when you request the Advance; (b) the due-date chosen by you when

extending your due-date within the app; or (c) any time Brigit sees a positive cash inflow into

your linked bank account even if that available cash is not enough to pay the full amount owed

on the Advance."  *Id*.  Thus, if on the due date there are insufficient funds in the linked account

to repay the advance, Brigit has a continuing right to monitor the account and debit it until the

advance is repaid.  The consumer may also repay manually by self-initiating an ACH transfer to

Brigit without any early payment penalty.  *Id*.  The TOS disclaims responsibility for "any

overdraft fees, over-the-limit fees, or insufficient fund charges . . . that result from your failure to

maintain a balance . . . sufficient to repay an Advance."  *Id*. at 11.  It also states: "YOUR

ADVANCE IS NOT CONDITIONED ON WHETHER YOU ELECT TO REPAY VIA

PREAUTHORIZED ACH REPAYMENT OR MANUAL REPAYMENT."  *Id*.

### D.  "No Recourse" Clause

Section 7.6.2 of the TOS is titled "No Recourse In the Event of Non-Payment" and

provides:

> Brigit warrants that it has no legal or contractual claim against you based on a failure to repay an Advance.  In the event you fail to repay an Advance, Brigit will suspend your access to future Advances until you repay the outstanding Advance in full.  With respect to a failure to repay an Advance, Brigit warrants it will not engage in any debt collection activities, place the amount owed with or sell to a third party for the purpose of debt collection activities, or report you to a consumer reporting agency.

*Id.* at 10.  Brigit "may send you an email, text or SMS message reminding you of an upcoming

payment, however, such email, text or SMS message should not be construed as a demand for

6

payment." *Id*. at 10–11.

The TOS also specifies that Section 7.6.2 "sets forth Brigit's recourse against you in the event that an Advance is not repaid" and that "[a]ny other recourse or remedies claimed by Brigit, including but not limited to, indemnities, limitations on liability, and disclaimers of warranty described in the Terms do not apply to non-payment of an Advance." *Id*. at 10. Notably, while the "no recourse" clause limits Brigit's remedies for nonpayment of an advance, it does not disclaim Brigit's right to enforce the TOS as a whole.  Brigit retains the right to terminate or suspend the user's account "at any time for any reason," including where Brigit "reasonably believe[s] that you are engaging in activities intended to exploit, manipulate, or misuse the Services." *Id*. at 16.  And Brigit retains the right to enforce the consumer's indemnification obligations, representations and warranties, and other contractual duties through binding arbitration. *See id*. at 16, 20–21.

### E.  Revocation Mechanism

Section 7.3 of the TOS addresses the consumer's right to revoke authorization for a preauthorized debit.  The relevant language provides:

> [T]he electronic debit authorization contained in this Section represents your written authorization for automated clearinghouse ("ACH") transactions as provided herein and will remain in full force and effect until you notify Brigit that you wish to revoke this authorization by emailing info@hellobrigit.com.  You must notify Brigit at least three (3) business days before the scheduled debit date in order to cancel this authorization.  When you contact us, you must include the name and telephone number associated with your Brigit User Account.  Failure to provide correct and complete information may make it impossible for Brigit to stop withdrawal of the preauthorized withdrawal.

*Id.* at 6.  If Brigit does not receive notice "at least three (3) business days before the scheduled debit date," it "may attempt, in our sole discretion, to cancel the transaction" but "assume[s] no responsibility for [its] inability to do so." *Id*. at 7.

7

Several features of the revocation mechanism are worth noting.  First, Plaintiffs allege that the Brigit app itself "does not allow users an option to cancel the repayment debit or disconnect their bank account from which repayment is automatically" drawn.  Compl. ¶ 115. Revocation must instead be accomplished by email to a specific address (info@hellobrigit.com), not through the app.  TOS at 6.  The TOS also contains precise requirements for the contents of the email.  The email must include both the consumer's name and the telephone number associated with the account; "[f]ailure to provide correct and complete information may make it impossible for Brigit to stop withdrawal." *Id*.  Furthermore, the consumer bears the risk of a failed revocation: the TOS requires the consumer to "indemnify and hold harmless Brigit from and against any loss incurred as a result of its withdrawal of a preauthorized debit transaction from your Bank Account if any of the information relied upon in your request to stop payment is incorrect or incomplete." *Id*.  And finally, if the three-business-day deadline is missed, Brigit has no obligation to honor the revocation request—it "may attempt, in [its] sole discretion," to cancel the transaction, but "assume[s] no responsibility for [its] inability to do so." *Id*. at 7.

## PROCEDURAL HISTORY

This case was initiated by a complaint filed in New York State Supreme Court, New York County, on March 20, 2025.  Dkt. No. 1.  The original complaint included claims for violations of the Military Lending Act ("MLA"), *see* 10 U.S.C. § 987, and the Truth in Lending Act ("TILA"), *see* 15 U.S.C. § 1638.  Dkt. No. 1-1 ¶¶ 110–29.  In particular, the complaint alleged that Defendant violated the MLA by offering consumer credit to military members in excess of the 36% interest rate cap on such loans. *Id*. ¶¶ 110–22.  The complaint also alleged that Defendant violated TILA by failing to provide specific financing disclosures prior to consummating the loans. *Id*. ¶¶ 123–29.

On May 7, 2025, Defendant removed the case to this Court pursuant to 28 U.S.C. §§ 1441 and 1446, asserting federal-question jurisdiction under 28 U.S.C. § 1331.  Dkt. No. 1.

On June 13, 2025, Defendant filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 12.  That motion was rendered moot when, on June 27, 2025, Plaintiff filed the Amended Complaint.  Dkt. No. 24.  Plaintiff filed a Corrected Amended Complaint on July 10, 2025.  Dkt. No. 30.[3]  The Amended Complaint added additional Plaintiffs and causes of action under the Georgia Payday Lending Act and the Illinois Predatory Loan Prevention Act.  *Id.* ¶¶ 171–89.

Defendant filed this motion to dismiss the complaint or, in the alternative, to compel arbitration on July 18, 2025.  Dkt. No. 31.  It also filed a memorandum of law in support of the motion and the declaration of counsel, attaching exhibits.  Dkt. Nos. 32–33.  On August 12, 2025, Plaintiffs filed a memorandum of law in opposition to the motion to dismiss.  Dkt. No. 34.  On August 27, 2025, Defendant filed a reply memorandum of law in further support of the motion to dismiss.  Dkt. No. 35.  From August 2025 through February 2026, Plaintiffs filed several notices of supplemental authority, *see* Dkt. Nos. 36, 40, 52, 56, 60, 63, and Defendant filed responses, Dkt. No. 38, 50, 53, 60, 66.

The Court held oral argument on February 19, 2026.  Feb. 19, 2026 Minute Entry.  Later that same day, Plaintiffs filed a notice of voluntary dismissal of the state law claims in the Amended Complaint.  Dkt. No. 65.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient

---

[3] Citations to the Amended Complaint are to the Corrected Amended Complaint at Dkt. No. 30.

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555.  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), a district court may consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

Courts deciding motions to compel arbitration "apply a 'standard similar to that applicable for a motion for summary judgment.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)).  That means that courts must "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draw all reasonable inferences in favor of the non-moving party." *Id.* (cleaned up and citations omitted).  "Where a party seeks to compel arbitration, a party resisting

10

arbitration 'should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'"  *Lowe*, 2026 WL 654719, at *2 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 628 (1985)).

## DISCUSSION

Plaintiffs allege that Instant Cash advances are "consumer credit" or "loans" subject to the MLA and TILA, and that the associated fees constitute "finance charges" that violate rate caps and disclosure requirements.  Compl. ¶¶ 150–70.  Plaintiffs further contend that because the MLA applies, the arbitration agreement in the TOS is unenforceable.  Dkt. No. 34 at 28 (citing 10 U.S.C. § 987(f)(4)).

Defendant responds that TILA and the MLA do not apply for two independent reasons: (1) the Instant Cash product fails to extend "credit" because "a consumer does not incur a debt (or receive credit) if he has no obligation to repay," Dkt. No. 32 at 15; and (2) the product is also not subject to a finance charge because "customers may obtain an Instant Cash advance regardless of whether they pay such a fee—so those fees are not 'imposed . . . by' Brigit on customers as an incident to their use of Instant Cash," Dkt. No. 35 at 6.  Courts nationwide have recently confronted, and nearly uniformly rejected, similar arguments regarding similar products. *See, e.g.*, *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 935–38 (N.D. Cal. 2025); *Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036, 1049 (N.D. Cal. 2025); *Johnson v. Activehours, Inc.*, 2025 WL 2299425, at *8–9 (D. Md. Aug. 8, 2025); *Vickery v. Empower Fin., Inc.*, 2025 WL 2841686, at *3–7 (N.D. Cal. Oct. 7, 2025); *Russell v. Dave Inc.*, 2025 WL 3691977, at *5–8 (C.D. Cal. Dec. 12, 2025); *Burrison v. Floatme, Corp.*, 2026 WL 444638, at *5–8 (D. Mass. Feb. 17, 2026); *Moss v. Klover Holdings, Inc.*, 2026 WL 622653, at *4–7 (N.D. Ill. Mar. 5, 2026); *Lowe v. Moneylion Techs. Inc.*, 2026 WL 654719, at *2–4 (S.D.N.Y. Mar. 9, 2026).  *But see*

11

*Golubiewski v. Activehours, Inc.*, 2024 WL 4204272, at *6 (M.D. Pa. Sept. 16, 2024).

This Court now joins those courts and holds that the Amended Complaint as pleaded states a claim for relief.  The Court further concludes that the issue of arbitrability follows directly from whether the Amended Complaint survives Defendant's Rule 12(b)(6) motion.  The motion to compel arbitration is therefore also denied.

## I.  The Amended Complaint States a Claim Because Brigit Extends "Consumer Credit."

### A.  Statutory Background

"TILA was enacted in 1968 to protect consumers against inaccurate and unfair credit billing and credit card practices and promote the informed use of credit by assuring a meaningful disclosure of credit terms."  *Strubel v. Comenity Bank*, 842 F.3d 181, 186 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Vincent v. The Money Store*, 736 F.3d 88, 105 (2d Cir. 2013)). Congress enacted TILA against the backdrop of a consumer credit market in which the use of credit was "expanding at an extremely rapid rate," but lenders disclosed terms in inconsistent and often incomprehensible ways, making it difficult for borrowers to compare the true cost of competing products.  *See Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 363–64 (1973). The statute's core purpose is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."  15 U.S.C. § 1601(a); *see Ford Motor Co. v. Milhollin*, 444 U.S. 555, 568 (1980) (describing the "concept of 'meaningful disclosure' that animates TILA"). For example, TILA aims to ensure that a borrower offered a short-term advance at a "small fee" can determine whether that fee, expressed as an annual percentage rate, represents a cost of 15% or 400% of the advance.  *See Windward Bora, LLC v. Regalado*, 751 F. Supp. 3d 122, 134 (E.D.N.Y. 2024).

TILA requires certain disclosures by a "creditor" in a "consumer credit transaction." 15 U.S.C. § 1638(a). The statute defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment," *id.* § 1602(f), and "creditor" as a person "who both (1) regularly extends . . . consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness," *id.* § 1602(g).[4] The statute does not define "debt." TILA directs the Consumer Financial Protection Bureau ("CFPB") to "prescribe regulations to carry out the purposes" of the statute, *id.* § 1604(a), and the CFPB has done so through rules contained in "Regulation Z," *see* 12 C.F.R. pt. 1026.[5] Regulation Z defines "finance charge" as including "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a); *see also* 15 U.S.C.A. § 1605(a).

The MLA was enacted in 2006 in response to a Department of Defense report documenting the effects of predatory lending on military readiness. *See Steines v. Westgate Palace, L.L.C.*, 113 F.4th 1335, 1343 (11th Cir. 2024). It extends additional lending protections to active-duty servicemembers and their dependents. *See* 10 U.S.C. § 987. The MLA caps the military annual percentage rate ("MAPR") at 36 percent for covered consumer credit, *id.* § 987(b), imposes disclosure requirements beyond those required by TILA, *id*. § 987(c), and

---

[4] The statute states that "[t]he adjective 'consumer,' used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(i).
[5] Regulation Z was originally promulgated by the Federal Reserve Board. The Dodd-Frank Act transferred rulemaking authority from the Federal Reserve Board to the CFPB in 2011. *See* Pub. L. No. 111-203, § 1100A, 124 Stat. 1376, 2107.

prohibits creditors from, among other things, requiring servicemembers to submit to arbitration or to waive their right to legal recourse under state or federal law, *id.* § 987(e)(2)–(3). The MLA's implementing regulations define "credit" using language materially identical to TILA's: "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). As with TILA, the term "debt" is undefined. "Consumer credit" under the MLA is such credit offered primarily for personal, family, or household purposes that is "subject to a finance charge" or "payable by a written agreement in more than 4 installments." *Id.* § 232.3(f)(1). The MLA's implementing regulations expressly incorporate Regulation Z's definition of "finance charges." *See* 32 C.F.R. § 232.3(n). Any credit agreement that violates the MLA is deemed void from its inception. 10 U.S.C. § 987(f)(3).

In sum, TILA and the MLA cover certain consumer credit transactions defined as those that (1) create a debt and (2) are subject to a finance charge. Brigit argues that neither requirement is met here and that it therefore does not extend consumer credit. The Court will address each requirement in turn.

### B. Instant Cash Creates a Debt.

The first question is whether Instant Cash involves a "right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h); 15 U.S.C. § 1602(f). The parties agree that if Instant Cash creates a debt, its payment is deferred. *See, e.g.*, Dkt. No. 35 at 2. Plaintiffs have plausibly alleged that Instant Cash creates a debt.

Because the relevant statutes and regulations do not define the term "debt," it must be given its ordinary meaning. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012); *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011); *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be

14

interpreted as taking their ordinary, contemporary, common meaning.").  In assessing ordinary meaning, the parties invoke the same dictionary definitions.  *See* Dkt. No. 32 at 12; Dkt. No. 34 at 9.  Black's Law defines "debt" as "[l]iability on a claim; a specific sum of money due by certain and express agreement."  *Debt*, Black's Law Dictionary (12th ed. 2024).[6]  Merriam-Webster's defines it as "something owed; obligation," or "a state of being under obligation to pay or repay someone or something in return for something received; a state of owing."  *Debt*, https://www.merriam-webster.com/dictionary/debt (last accessed Mar. 31, 2026).

The "advances" provided by Brigit describe debt to a tee.  Brigit's own language is clear on this point.  The TOS states that "[i]f you . . . use Instant Cash . . . [or] any of the Services for which *payment to Brigit is required, including use of the Advance Service*, you authorize Brigit, its parents, subsidiaries, partners, third-party service providers, affiliates, agents, and assigns to electronically debit your Payment Method for the applicable amounts, including, but not limited to, *payments of cash advances*, any loan repayments, and/or monthly Subscription Fees."  TOS at 6 (emphasis added).  Thus, in return for receiving a cash advance—"for which payment to Brigit is required"—consumers expressly agree that Brigit may debit their bank accounts at a later date for repayment of the amount of the advance (and, in most cases, a fee).  If insufficient funds are in the account on the due date, consumers further agree that Brigit may debit their account at any later date when there are positive cash flows into it.  *Id.* at 10.  Brigit customers therefore have an "obligation to pay or repay someone or something in return for something received."  *See Debt*, https://www.merriam-webster.com/dictionary/debt (last accessed Mar. 31, 2026).

---

[6] The parties cite contemporary dictionaries.  Dictionaries from the time of TILA's enactment in 1968 are in accord.  *See Debt*, Black's Law Dictionary (4th ed. 1968).  Black's Law from 1968 further clarifies that a "sum of money due by certain and express agreement" means that the amount of payment is certain or ascertainable.  *See id.*

Other portions of the TOS confirm as much.  The TOS explains that users "warrant and represent to Brigit that [they] have the right to authorize [Brigit] to charge and debit [their] Bank Account or debit card . . . *for payments due to us* under the Terms."  *Id.* at 7 (emphasis added). And elsewhere, the TOS repeatedly refers to the "due date" for repayment of an advance.  *Id.* at 10–11.  The term "due" is advised.  It connotes a sum "owed or owing as a debt."  *Due*, https://www.merriam-webster.com/dictionary/due (last accessed Mar. 31, 2026); *see also Due*, Black's Law Dictionary (12th ed. 2024) (defining "due" in part as "owing or payable; constituting a debt").  Accordingly, when a consumer obtains cash from Brigit, it agrees that repayment is "owed or owing as a debt" on a specified date.

Defendant resists this straightforward conclusion, arguing that there is no obligation to repay an advance because (1) Brigit has disclaimed any "legal or contractual claim" against the Plaintiffs "based on a failure to repay an Advance" and has covenanted that it "will not engage in any debt collection activities" or report Plaintiffs to a "consumer-reporting agency," Dkt. No. 32 at 14 (quoting TOS at 10); and (2) a consumer can rescind the repayment authorization it provided for Defendant to debit its bank account before repayment of an advance, Dkt. No. 35 at 2–3.  In other words, Brigit argues that it lacks recourse against both the individual and their bank account and that therefore no debt is established.  Dkt. No. 35 at 4–5.  Neither argument is persuasive.  Recourse against an individual is not required to create a debt, and a consumer's ability to rescind repayment authorization does not defeat the debt that is created when she seeks and receives an advance.

### 1.  Legal Recourse Against the Individual Is Not Required

The Court starts with a simple but important point: The fact that Brigit has disclaimed legal and contractual claims against a borrower who fails to repay an advance does not mean that

the borrower has no obligation to repay.  Recourse against the individual is not an essential feature of debt.  Put another way, a person who agrees that a lender can be repaid through execution on the borrower's property is no less a debtor than a person who agrees he can be subject to suit personally.  Defendant acknowledged as much during oral argument.  Oral Argument Transcript ("Tr.") at 14:12–23.

Many of the most common extensions of credit involve debts secured by property rather than by recourse against the individual personally.  Reverse mortgages—transactions in which a lender extends credit to a borrower and the borrower's principal dwelling serves as security for the loan—present one such example.  Regulation Z expressly recognizes these nonrecourse transactions as establishing a "consumer credit obligation."  *See* 12 C.F.R. § 1026.33(a); *see also Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 411 (1998) (applying TILA to a reverse mortgage without questioning its status as consumer credit); *Olson v. Unison Agreement Corp.*, 2025 WL 2254522, at *2 (9th Cir. Aug. 7, 2025) (unpublished).[7]

Alternatively, a consumer who does not have or wish to offer a dwelling as security may offer a car or an item of physical chattel rather than her person as security.  These so-called "pawn" transactions take many forms, but all involve borrowing money and incurring a debt in exchange for conveying the right to the lender to execute against property rather than against the borrower personally for the sums borrowed.  In a vehicle title loan, for example, the borrower

---

[7] The MLA carves out reverse mortgages from its scope, *see* 10 U.S.C. § 987(i)(6); 32 C.F.R. § 232.3(f)(2)(i), but not because they fail to extend credit and create a debt.  They plainly do.  In fact, these transactions' specific exclusion from the MLA's definition of "credit" only underscores that a normal understanding of the term covers them.  The MLA was enacted in response to a 2006 Department of Defense report focused on a particular ecosystem of predatory loans, which did not include mortgages.  *See* Dep't of Def., *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* 2 (2006) ("Mortgage lending was not considered by these counselors as having the level of prevalence associated with the types of loans listed above, and consequently was not reviewed as part of this report.").

receives cash in exchange for pledging the vehicle's certificate of title as security; upon repayment of the loan and associated charges, the borrower regains title to the vehicle.  If the borrower fails to repay, the pawnbroker's sole remedy is to retain and sell the pledged item (be it a car, watch, guitar, ring, etc.)—the pawnbroker has no claim against the borrower personally.

These transactions extend consumer credit.  Indeed, in 2007, the Department of Defense recognized vehicle title loans as one of three quintessential examples of consumer credit in its regulations implementing the MLA.  *See* Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 72 Fed. Reg. 50580, 50592 (Aug. 31, 2007).  In 2015, the Department amended the regulation "primarily for the purpose of extending the protections of the MLA to a broader range" of products beyond those three that "present the *most severe* risks to Service members and their families."  *See* Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 80 Fed. Reg. 43560, 43560, 43567 (July 22, 2015) (codified at 32 C.F.R. 232.3).  As such, vehicle title loans are no longer expressly recognized as consumer credit transactions in the regulations, but if anything, the 2015 amendment strengthens these loans' classification as consumer credit.  *See also In re Spinner*, 398 B.R. 84, 92 (Bankr. N.D. Ga. 2008) (applying TILA to a vehicle title loan); *Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1111–13 (S.D. Ala. 1997) (same); *Barlow v. Evans*, 992 F. Supp. 1299, 1303–06 (M.D. Ala. 1997) (same); *Cox v. Cmty. Loans of Am., Inc.*, 2014 WL 1216511, at *8 (M.D. Ga. Mar. 24, 2014), *aff'd*, 625 F. App'x 453 (11th Cir. 2015) (applying the MLA to vehicle title loans notwithstanding the defendants' argument that "Plaintiffs did not take on 'debt' because Plaintiffs did not incur any personal liability to repay the 'money advanced'").[8]

---

[8] The MLA does not cover "loan[s] procured in the course of purchasing a car or other personal property, when that loan is offered for the express purpose of financing the purchase and is secured by the car or personal property procured."  10 U.S.C. § 987(i)(6).  But so long as the

Likewise, and most closely analogous to this case, a person can borrow money and assume a debt by (1) accepting cash immediately and (2) delivering in return a post-dated check permitting the lender on a later date to draw a sum from the borrower's bank account greater than the amount that is borrowed. The defining characteristics of these "deferred presentment" transactions, also called payday loans, are that the service provider agrees to pay the customer a specific amount and, in exchange, the costumer tenders to the service provider the customer's check, which the service provider agrees to hold for a period of time before negotiation, redemption, or presentment. *See, e.g.*, Mich. Comp. Law § 487.2122(g); Fla. Stat. § 560.402(4); Nev. Rev. Stat. § 604A.050; Alaska Stat. § 06.50.900(4).[9] In effect, the consumer agrees to the payment of sums in the future "for the privilege of obtaining cash . . . today." *Hamilton v. York*, 987 F. Supp. 953, 958 (E.D. Ky. 1997).

These transactions create debt and are considered consumer credit transactions both under the ordinary meaning of the term and as a matter of state and federal law. *See Turner v. E-Z Check Cashing, Inc.*, 35 F. Supp. 2d 1042, 1045, 1048 (M.D. Tenn. 1999) ("Courts that have addressed the issue have held, without exception, that deferred presentment transactions are extensions of 'credit' under TILA."); *Arrington v. Colleen, Inc.*, 2001 WL 34117735, at *3 (D. Md. Mar. 29, 2001) (collecting cases); *In re Miller*, 215 B.R. 970, 974 (Bankr. E.D. Ky. 1997) ("If this is not an extension of credit, [it is] hard to imagine any transaction that is."); *cf.* 12 C.F.R. pt. 1026, Supp. I, Paragraph 2(a)(14) Credit ¶ 2 (official interpretations of Regulation Z

---

loan is not offered for the express purpose of financing the very collateral securing the loan, the MLA applies. *See Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 128 (4th Cir. 2023) (analyzing whether a particular loan involving a car was for the express purpose of financing the car, and assuming that if the loan was not offered for that express purpose, TILA would apply).
[9] *See* 12 C.F.R. § 1026.2(b) (TILA's implementing regulations stating that undefined terms are informed by state law and contract).

noting that "credit" includes "a transaction in which a cash advance is made to a consumer in exchange for the consumer's personal check, and where the parties agree either that the check will not be cashed or deposited, or that the consumer's deposit account will not be debited, until a designated future date").

The Instant Cash product is substantially similar. In exchange "for the privilege of obtaining cash . . . today," *Hamilton v. York*, 987 F. Supp. at 958, the consumer tenders to Brigit the right to debit the consumer's bank account for the sums advanced on a "due" date in the future. It is immaterial that the right to draw on the account takes the form of an ACH authorization rather than a post-dated check. Both operate against the same asset—the funds on deposit in the consumer's bank account—and both serve the same economic function: they give the creditor a mechanism to collect repayment directly from the borrower's account on a future date, rather than going through the burdensome process of suing the borrower personally and then, after obtaining a judgment, executing upon that judgment. Indeed, having an ACH authorization against the consumer's bank account (much like having a physical check) is undoubtedly more valuable to the creditor and provides greater security than being forced to go to court and enforce a judgment. The debit authorization mechanism in the TOS permits Brigit to short-circuit that process.

### 2. *The Right to Revoke ACH Authorization Does Not Negate the Debt Created*

Brigit argues that Instant Cash is unlike the products detailed above because Brigit lacks recourse against not only the individual *but also the underlying asset*. Dkt. No. 35 at 3–5. Brigit does not point to any language in the TOS stating outright that there is no recourse against the underlying asset. Instead, Brigit relies on language in Section 7.3 of the TOS, which states that the written authorization for ACH transactions that the consumer has provided as a condition for

20

receiving the advance "will remain in full force and effect" until the consumer notifies Brigit of the consumer's "wish" to revoke the authorization, which the consumer must do: "at least three (3) business days before the scheduled debit date"; by email; and by providing the correct name and telephone number associated with the consumer's account. TOS at 6. Because a consumer could theoretically withdraw ACH authorization after receiving an advance but before the repayment due date, Brigit contends that it has no recourse against the bank account and that there is no debt. The Court disagrees.

The principal flaw in Brigit's argument is that it elides the distinction between the obligation that is created when a Brigit consumer receives an advance with the consumer's qualified right to revoke a method of recourse after assuming that obligation. As previously explained, in order to receive an advance, a consumer must grant Brigit access to her bank account and "authorize Brigit, its parents, subsidiaries, partners, third-party service providers, affiliates, agents, and assigns to electronically debit [her] Payment Method for the applicable amounts, including, but not limited to, payments of cash advances" on a date when repayment is "due." TOS at 6–7. All of the elements necessary to create a binding legal obligation are satisfied when the consumer requests an advance and Brigit agrees to extend one. *See Vincent v. Nat'l Debt Relief LLC*, 2024 WL 3344227, at *5 (S.D.N.Y. July 8, 2024) (detailing requirements for formation of online consumer contracts). The consumer makes a request (an "offer"), Brigit agrees to accept that offer after its underwriting requirements have been satisfied ("acceptance"), and the transaction is supported by consideration: Brigit provides the cash advance, while the consumer agrees that "Brigit [has the right] to charge [the consumer's] Payment Method in accordance with the Credit and Debit Authorization" and can do so on the due date. TOS at 10. Brigit forswears any right of recourse against the consumer directly. But it decidedly does not

forego the right to proceed against the consumer's bank account.

Section 7.3 presupposes the existence of an obligation that the consumer has a limited right to revoke.  The consumer represents that the electronic debit authorization she has provided constitutes her "written authorization for [ACH] transactions" and warrants that the authorization "will remain in full force and effect."  *Id.* at 6.  The consumer can under certain circumstances revoke that authorization.  But the right to do so is qualified.  Section 7.3's language, which states that the consumer may "wish to revoke this authorization," connotes that the consumer is taking back what has already been given.  And what has been given is an obligation in consideration for the advance.

The right that the consumer has to avoid Brigit drawing on her bank account thus may be analogized to the familiar distinction from contract law between contracts that are void and ones that are voidable.  A "promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor" is void.  Restatement (Second) of Contracts § 7 cmt a (A.L.I. 1981).  "[S]uch a promise is not a contract at all"; it has no legal effect.  *Id.*  A "voidable" contract, by contrast, creates obligations that may be "avoided."  It is "one[] where one or more parties have the power[] by a manifestation of election to do so[] to avoid the legal relations created by the contract."  *Id.*; *accord In re Estate of Rothko*, 372 N.E.2d 291, 299 (N.Y. 1977).  Unless and until the party holding the power of avoidance properly exercises that right, the parties remain in legal relations.  *See Rothko*, 372 N.E.2d at 299 ("Where a contract is voidable on both sides, . . . the transaction is not wholly void, since in order to prevent the contract from having its normal operation the claim or defense must in some manner be asserted and also since the contract is capable of ratification, such a contract affects from the outset the legal relations of the parties."); *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26,

31 (2d Cir. 2001) ("Unlike a void contract, a voidable contract is an agreement that '[u]nless rescinded . . . imposes on the parties the same obligations as if it were not voidable.'" (quoting 1 Williston on Contracts § 20 (4th ed. 1990)); *see also First Int'l Bank of Isr., Ltd. v. Blankstein & Son, Inc.*, 452 N.E.2d 1216, 891 (N.Y. 1983) (explaining that an agreement "rescindable at will" is a "voidable obligation"); *Weiss v. Phillips*, 65 N.Y.S.3d 147, 155 (1st Dep't 2017) (explaining that a voidable transaction is "one where a transfer is deemed to have occurred, but can be revoked").[10]

A promise is not enforceable unless supported by consideration. *See Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 228 (2d Cir. 2023). But the fact that a consumer may with three days' notice withdraw ACH authorization does not deprive the transaction between the consumer and Brigit of legal effect or render illusory the consumer's obligation to repay the advance, which is formed at the moment the consumer requests the advance and agrees to the TOS, including that her account may be debited. The consumer's obligation is not "so insubstantial as to impose no obligation" at all on her. *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 495 (S.D.N.Y. 2023); *see also* Restatement (Second) of Contracts § 7 cmt. a. It is black letter law that "[a]lthough a contract might seemingly permit one party to cancel or terminate the undertaking, a closer examination of the agreement might reveal that it, in some way, limits or restricts that party's power to rescind

---

[10] Contracts terminable at will by one party are routinely enforced up to the point of termination; the right to terminate does not retroactively void the obligations that accrued before it was exercised. *See, e.g.*, *R&D Hotel, LLC v. Stop & Shop Supermarket Co. LLC*, 2016 WL 4367971, at *3 (S.D.N.Y. Aug. 15, 2016) (rejecting the argument that because one party could "unilaterally terminate the Lease . . . there was never a legitimate agreement between the parties," and holding instead that, under New York law, a contract is not illusory merely because one party has such discretion); *Lebowitz v. Dow Jones & Co.*, 508 F. App'x 83, 84 (2d Cir. 2013) (summary order) ("Under New York law, a contract is not illusory merely because its terms give discretion to one party to the contract. . . .").

or terminate the contract." 3 Williston on Contracts § 7:14 (4th ed. 2025). In that instance, the obligation is not illusory, and the agreement is supported by consideration. "[T]he tendency is to interpret even a slight restriction on the exercise of the right of cancellation, such as by imposing a sufficient condition upon the right of cancellation or termination," as enough to render the underlying obligation genuine rather than illusory. *Id.* Thus, for example, the obligation would not be illusory "where the reservation of the right to cancel is . . . upon written notice, or after a definite period following the giving of notice, or upon the occurrence of some extrinsic event." *Id.*; *see, e.g.*, *Johnson Lakes Dev., Inc. v. Cent. Neb. Pub. Power & Irrigation Dist.*, 576 N.W.2d 806, 817 (Neb. 1998) ("Even a slight restriction on the exercise of the right of termination, such as the requirement that advance notice be given, is sufficient to prevent a unilateral right of termination from being regarded as illusory in nature."); *Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.*, 470 F. Supp. 1308, 1316 (N.D.N.Y. 1979) ("[Defendant] contends that a unilateral termination clause, without the imposition of good faith limitations, constitutes an illusory promise, lacking in consideration. However, a notice provision, such as that contained in the termination clause in question here, prevents the promise, made by the party with the right of termination, from being regarded as illusory in nature.").

Brigit's TOS imposes meaningful contractual limits on the right to rescind ACH authorization. For one, Plaintiffs allege that Brigit provides no in-app mechanism for canceling a scheduled repayment debit. Compl. ¶ 115. Revocation is also subject to three conditions, the failure of any one of which makes the revocation ineffective. Any revocation must (1) be made three business days before the scheduled debit date; (2) be directed to the specified email address provided by Brigit in the TOS; and (3) include the name and telephone number associated with the consumer's Brigit account. TOS at 6. Thus, to revoke, the user must know that the right

24

exists (it appears in the TOS, not in the app interface) and exercise it in a particular manner and in a specific window.[11]  A user who sends the email to the wrong address, includes the wrong information in the message, or sends the email two days before the repayment date rather than three will have failed to revoke.  And the consumer agrees to relieve Brigit of any liability and hold it harmless "if any of the information relied upon in your request to stop payment is incorrect or incomplete."  *Id.*  The consumer has received value, has authorized a specific mechanism for repayment, and—unless she takes affirmative and specific steps to disrupt that mechanism—the debit will proceed as scheduled.  That is the hallmark of a voidable obligation, not an illusory one.  *See In re Estate of Rothko*, 372 N.E.2d at 299.

An example demonstrates the point.  If, in a deferred presentment transaction, a lender gave the borrower a right to retrieve her post-dated check, but only if she traveled to the lender's faraway offices and arrived between 12:30 and 1:00 PM on the Wednesday before the date on which the check would be tendered, the transaction between the parties would still constitute a loan.  The repayment obligation that the borrower assumed when she provided the post-dated check would not be an illusory one.  Neither is the obligation here.  The fact that Brigit's consumer can under certain prescribed circumstances withdraw the authorization previously

---

[11] Plaintiffs allege that "Brigit provides no mechanism for cancelling repayment debits," and that "[o]nce an Instant Cash loan has been taken, the app does not allow users an option to cancel the repayment debit or disconnect their bank account from which repayment is automatically scheduled to be drawn."  Compl. ¶ 115.  Indeed, the email revocation described in Section 7.3 of the TOS is seemingly the only path by which a consumer can escape the obligation to repay.  A consumer who closes her linked bank account while an advance is outstanding would appear to breach both the Section 7.3 warranty that she "ha[s] the right to authorize [Brigit] to charge and debit [her] Bank Account," TOS at 7, and the Section 12.1 representation that her linked bank account information is "accurate, current, and complete," *id*. at 16–17.  Those appear to be independent obligations for which the "no recourse" clause does not limit Brigit's remedies.  *See id*. at 10 (Section 7.6.2 providing that "[a]ny other recourse or remedies claimed by Brigit, including but not limited to, indemnities, limitations on liability, and disclaimers of warranty described in the Terms do not apply to non-payment of an Advance").

provided does not render illusory the prior agreement to provide such authorization and allow the account to be debited.  Of course, the method of revocation here might be more convenient for the consumer, but in both instances, there are meaningful limitations on the revocation right such that the underlying repayment obligation established is a genuine one.  Put another way, the substance of the parties' relationship is one in which there are real obligations running in both directions.  *See Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 158 (1981) (cautioning courts not to "elevat[e] form over substance" in analyzing the applicability of TILA); *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 753 (7th Cir. 2000) (noting the Seventh Circuit's "consistent assertion that courts are to focus on the economic substance of the transaction in determining whether TILA has been violated"); *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993) (same).

Brigit argues that Plaintiffs' argument would mean that "every consumer enrolled in autopay for a subscription service . . . [would have] an 'obligation' to pay for the following month, simply because a debit will occur unless the consumer cancels before the next month." Dkt. No. 35 at 1.  Brigit contends that "[a] person with a video-streaming subscription does not have an *obligation* to pay for future months simply because they have enrolled in autopay." *Id.* at 3.  The analogy is both imprecise and inapt.  Assuming, as Brigit asserts, that the payment is for future months, then no debt would be created because up to the point that the consumer is debited, the consumer has not received anything for which payment or repayment might be due.  And, assuming Brigit instead means by its hypothetical to refer to a situation where the service provider comes to enjoy the right to debit the consumer's account by virtue of the consumer's continued use of a service after a period of time, there would in that instance be no obligation until the consumer—with notice—continues to use the service after the specified period of time.

26

*See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly becomes binding on the offeree.").  Here, Brigit does not obtain its right to access the consumer's account by inaction.  It obtains that right by the consumer's action in taking the advance with notice that the taking of the advance gives Brigit the right to repayment.  *See* TOS at 6 (explaining that if the consumer "use[s] Instant Cash or use[s] any of the Services for which payment to Brigit is required, including use of the Advance Service, [the consumer] authorize[s] Brigit . . . to electronically debit" the consumer's account for the applicable amounts).  On any ordinary understanding of the relevant terms, there is a "debt" or "obligation" where someone receives an advance in exchange for agreeing to authorize repayment on a future date.

   *3.  The CFPB Opinions*

   The Court's conclusion that Instant Cash extends a debt fits comfortably within the CFPB's own regulatory treatment of EWA products.  Over the course of four years and three presidential administrations, the CFPB has issued two advisory opinions and one proposed interpretive rule addressing whether EWA products constitute "credit" under Regulation Z.  In none does the CFPB accord operative significance to the fact that the advance is non-recourse against the individual's person, or that there might be events (such as an ACH authorization revocation) which result in the creditor failing to recover the balance of the advance.  Rather, the distinction the CFPB has consistently drawn turns on whether the provider is merely facilitating early access to wages that the employee has already earned or instead extending its own funds against the employee's bank account.

27

In December 2020, the CFPB issued an advisory opinion (the "2020 Opinion") concluding that a narrow category of employee-partnered EWA programs do not involve the offering or extension of credit as defined by Regulation Z.  *See* Truth in Lending (Regulation Z); Earned Wage Access Programs, 85 Fed. Reg. 79404, 79405 (Dec. 10, 2020).  The 2020 Opinion defined the exempted "Covered EWA Programs" as those meeting all of several identified conditions, including: providing the consumer with no more than the amount of accrued wages earned; provision by a third party fully integrated with the employer; no consumer payment, voluntary or otherwise, beyond recovery of paid amounts via a payroll deduction from the next paycheck, and no other recourse or collection activity of any kind; and no underwriting or credit reporting.  *See id.* at 79405–06.

The CFPB reasoned that if all of those conditions are satisfied, the Covered EWA Program can be conceptualized as one that "facilitates employees' access to wages they have already earned, and to which they are already entitled, and thus functionally operates like an employer that pays its employees earlier than the scheduled payday." *Id.* at 79406.  The CFPB concluded that such programs were akin to a customer borrowing against the accrued cash value of an insurance policy because "the accrued cash value of an employee's earned but unpaid wages is the employee's own money," the "employee is 'in effect, only using the [employee's] own money' when she accesses earned wages through a Covered EWA Program, and is not incurring debt or deferring its payment," and "the Provider may only recover the corresponding EWA amounts via the allowed employer-facilitated payroll deduction" rather than from wages that have already been earned and paid. *Id.* at 79407.  The Bureau expressly distinguished such Covered EWA Programs from ones in which providers take "payment authorization from employees, such as a check, ACH, or debit card authorization" and "pull credit reports or credit

28

scores on individual employees or otherwise assess their credit risk." *Id.*[12]

Four years later, the CFPB issued a proposed interpretative rule (the "PIR") addressing the types of programs that were not included in the 2020 Opinion's protective mantle—that is, "'direct-to-consumer' products [that] provide funds to employees in amount that they estimate to be below accrued wages" where "funds are then recovered via automated withdrawal from the consumer's bank account." Truth in Lending (Regulation Z); Consumer Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work, 89 Fed. Reg. 61358, 61358 (July 31, 2024). The CFPB proposed to replace the 2020 Opinion with a new interpretative rule that would treat the employer-partnered products addressed by the 2020 Opinion the same as the direct-to-consumer products, with both being treated as creating "consumer credit." *Id.* at 61359–61. The CFPB reasoned that with both types of products, the consumer incurs an obligation to pay money at a future date, even if there is "an element of contingency" such as whether enough funds are available from the next payroll to cover the amount that the consumer received. *Id.* at 61360. "[T]hat is still an obligation to pay money at a future date," as "TILA has long been understood to cover contingent obligations." *Id.* at 61360. The proposed interpretative rule was not adopted.

In December 2025, the CFPB issued yet another advisory opinion (the "2025 Opinion"). Truth in Lending (Regulation Z); Non-Application to Earned Wage Access Products, 90 Fed. Reg. 60069 (Dec. 23, 2025). This opinion took issue with the conclusions reached by the PIR in

---

[12] Following issuance of the opinion, the CFPB further emphasized that the opinion was limited to free products, noting that products that include payment of any fee may still constitute credit. *See* Letter from CFPB General Counsel Seth Frotman to New Jersey Citizen Action (Jan. 18, 2022), https://tinyurl.com/2znp73ju (noting that the "advisory opinion, by its terms, is limited to a narrow set of facts—as relevant here, earned wage products where no fee, voluntary or otherwise, is charged or collected. . . . Products that include the payment of any fee, voluntary or not, are excluded from the scope of the advisory opinion and may well be TILA credit.").

2024 but did not take issue with the distinctions drawn by the 2020 Opinion.  The CFPB

concluded that EWA products with all of the following characteristics are not covered by

Regulation Z:

> (1) Covered EWA transactions do not exceed the accrued cash value of the wages the worker has earned up to the date and time of the transaction, which amount is determined based upon payroll data that evidence this amount. . . .

> (2) The provider uses a payroll process deduction in connection with the worker's next payroll event.  In a payroll process deduction, payment instructions received and acted upon by the payroll processor (or by the employer itself if it does not use a processor) enable the EWA provider to receive accessed amounts without debiting the consumer's regular transaction account after the consumer is paid.  A transfer to the provider from any of the consumer's regular transaction accounts after the payment of wages into that account is not a payroll process deduction.

> (3) Before providing Covered EWA, the provider clearly and conspicuously explains to the worker, and warrants to the worker as part of the contract between the parties, that it: (a) has no legal or contractual claim or remedy, direct or indirect, against the worker in the event the payroll process deduction is insufficient to cover the full amount of a Covered EWA transaction, including no right to take payment from any of the consumer's regular transaction accounts; and (b) will not engage in any debt collection activities related to Covered EWA, place a Covered EWA transaction amount as a debt with or sell it to a third party, or report to a consumer reporting agency concerning Covered EWA.

> (4) The provider does not directly or indirectly assess the credit risk of individual workers, including through obtaining and reviewing credit reports or credit scores about the individual workers.

*Id.* at 60071.  When all of those characteristics are satisfied, the CFBP concluded that what might

be characterized as an advance "resembles early wage payment and does not resemble an

extension of credit." *Id*. at 60072.  The CFPB reasoned that workers receiving such payments

have effectively received "earlier-than-normal access to wage amounts accrued, so they are owed

less at payday." *Id.*  "Rather than the consumer's repayment of a debt, the provider's payroll

process deduction from the payroll event associated with that work serves to ensure the

consumer is not effectively compensated twice for the same work." *Id.*  The CFPB stated that

the Covered EWA products are missing what it characterizes as the "defining element of 'credit,'" i.e., "a consumer's repayment," for the following reason: "When an EWA provider makes arrangements to ensure that the appropriate amount of the consumer's paycheck is directed to it through a payroll process deduction, the funds never touch the consumer's regular transaction account, and accordingly the consumer makes no deferred payment." *Id.*

These advisory opinions and the proposed interpretive rule do not carry the force and effect of law and are not binding on this Court. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*, 631 F. Supp. 3d 125, 143 (S.D.N.Y. 2022). Their reasoning, however, only reinforces the Court's conclusion. In neither of the opinions issued over the course of four years by two presidential administrations (with the same President), nor in the PIR (adopted during yet a third presidential administration), does the CFPB accord determinative weight to the fact that the advance provided by the EWA product is non-recourse against the individual's person or that EWA provider's right of repayment is contingent. The common thread running through the 2020 and 2025 opinions is that a provider escapes Regulation Z only when it functions as an adjunct to the payroll system—advancing no more than accrued wages collected through payroll deductions that intercept funds before they reach the consumer's bank account, and performing no independent assessment of the consumer's creditworthiness. Where the provider plays such a role, the CFPB has concluded, the provider is not extending credit by lending money to the consumer. It is giving the consumer access to her own money that she would not have had without the provider's services. In effect, the EWA provider is not lending money but solving a logistical challenge for employers who otherwise would be bound to the bi-weekly pay cycle.

Brigit's Instant Cash product satisfies none of those conditions. It is only nominally an

31

"earned wage advance" product.  Instant Cash does not operate in conjunction with the consumer's employer or through a payroll processor.[13]  Nor does it limit advances to accrued wages determined from employer-provided payroll data.  It engages in its own underwriting to determine each consumer's "Bank Account Health," "Spending Behavior," and "Earnings Profile," and it assesses how much to advance not on accrued earnings but based on the consumer's "past need and ability to pay back comfortably."  Compl. ¶¶ 100–01, 104.  "Brigit's underwriting process is both rigorous and continual."  *Id.* ¶ 102.  After reviewing a borrower's financials, Brigit determines that 20% of its customers are not credit-worthy and declines to offer them Instant Cash advance access.  *Id.* ¶ 103.  Brigit also collects repayment not through a payroll deduction but through a preauthorized debit against the consumer's personal bank account—including, under Section 7.6.1(c) of the TOS, "any time Brigit sees a positive cash inflow into your linked bank account even if that available cash is not enough to pay the full amount owed on the Advance."  TOS at 10.  And, while Brigit warrants to consumers that it will not sue them directly, it retains the right to collect the advance from funds contained in their primary bank account regardless of the source of those funds.  Under the CFPB's own framework(s), a product with these characteristics extends consumer credit.

### B.  Instant Cash Imposes "Finance Charges" Under TILA and the MLA.

Defendant next argues that even if Instant Cash creates a debt, the product still does not

---

[13] The notion that EWA products merely give consumers access "to their own money" through their employers' direct payroll or otherwise may not be determinative of whether the cash advances constitute "credit."  Tax refund anticipation loans ("RALs") provide consumers with early access to their own money by advancing funds in exchange for the right to collect a payment from the government in the amount of a taxpayer's anticipated tax refund.  *See* 1 Nat'l Consumer L. Ctr., *Truth in Lending* § 2.8.10.3 (11th ed. 2023).  These loans have long been understood to extend consumer credit.  *See* 72 Fed. Reg. at 50592 (Department of Defense recognizing RALs as one of the three original types of "consumer credit" covered by the MLA).

fall within the scope of TILA and the MLA because the advances are not subject to "a finance charge." 32 C.F.R. § 232.3(f)(1); 12 C.F.R. § 1026.2(a)(17)(i).[14]  Brigit asserts that it does not impose a finance charge because "a user can obtain an Instant Cash advance without paying anything, with the difference being whether the advance is delivered via ACH or expedited disbursement."  Dkt. No. 32 at 21.  This argument must also be rejected.

TILA and Regulation Z draw a distinction, in any given consumer credit transaction, between the "amount financed" and a "finance charge."  15 U.S.C. § 1638(a).  The two are mutually exclusive categories.  *Carlson v. Raymour & Flanigan Furniture*, 2011 WL 1793242, at *2 (W.D.N.Y. May 9, 2011); *Yarney v. Wells Fargo Bank, N.A.*, 2010 WL 3075460 (W.D. Va. Aug. 5, 2010) (amount financed and finance charges are "undeniably inversely related" in calculating total payments).  They must be disclosed and itemized separately.  *See* 15 U.S.C. § 1638(a)(2)–(3).  The "amount financed" is "the amount of credit of which the consumer has actual use."  15 U.S.C. § 1638(a)(2)(A).  The CFPB, to which Congress has delegated the authority to prescribe regulations containing "such classifications, differentiations, or other provisions . . . necessary or proper to effectuate the purposes of [TILA]," *id.* § 1604(a), has defined "finance charge" as "the cost of consumer credit as a dollar amount," 12 C.F.R. § 1026.4(a).  This includes "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit."  *Id.*  "Finance charge" under the MLA enjoys the same meaning.  32 C.F.R. § 232.3(n).[15]

---

[14] Plaintiffs do not allege that Instant Cash is payable in more than four installments, so the product is not consumer credit unless a charge associated with Instant Cash qualifies as a "finance charge."

[15] Plaintiffs acknowledge that subscription fees are exempted from the definition of "finance charge" under TILA and the MLA but state that these fees are nonetheless considered part of the MAPR.  *See* Dkt. No. 34 at 17 n.12.  The Court need not address that issue at this juncture.

The distinction between the two categories reflects Congress's core concern that creditors would "'bur[y]' the cost of credit in the price of goods sold" and that "in many credit transactions in which creditors claimed that no finance charge had been imposed, the creditor merely assumed the cost of extending credit as an expense of doing business, to be recouped as part of the price charged in the transaction." *Mourning*, 411 U.S. at 366.  "Congress was well aware, from its extensive studies, of the possibility that merchants could use such devices to evade the disclosure requirements of the Act." *Id.*

As indicated above, "finance charge" is defined in the disjunctive.  12 C.F.R. § 1026.4(a).  It includes charges that are either "incident to or a condition of the extension of credit." *Id.*  Thus, the charge need not be a necessary condition to the extension of credit.  The ordinary meaning of "incident to" when TILA was enacted encompassed things "usually connected with another, or connected for some purpose, though not inseparably."  Black's Law Dictionary (4th ed. 1968).  The Supreme Court has observed "incident to" "implies some *necessary* connection between the antecedent and its object"—that is, between the charge and the extension of credit.  *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 241 (2004) (citing *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 403, n. 9 (1996)).

At the time of TILA's drafting, the term "impose" meant: "to levy or exact as by authority; to lay as a burden, tax, duty, or charge."  Black's Law Dictionary (4th ed. 1968).  Notably, "impose" had a different and broader meaning than "require," which was defined as "[t]o direct, order, demand, instruct, command, claim, compel, request, need, exact." *Id.*  "Impose" connotes an exercise of authority by the party setting the charge, not a requirement that the charge be unavoidable by the party paying it.  The "finance charge" definition directly contrasts (i) charges "*payable* directly or indirectly by" the consumer with (ii) charges "*imposed*

directly or indirectly by" the creditor.  15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(a) (emphasis added).  "Imposed" thus identifies the party conducting the charging; it is not a standalone requirement that the charge be a sine qua non to access the credit.  As the Federal Reserve Board (the "Fed") has stated in the past, "the term 'imposed' is understood broadly, to include any cost charged by the creditor (unless otherwise excluded), including charges for optional services paid by the consumer."  Truth in Lending, 60 Fed. Reg. 66179, 66180 (Dec. 21, 1995).

Under TILA, a "finance charge" is not limited to interest as conventionally understood; nor does it exclude charges that in some way benefit the borrower.  *See, e.g.*, 12 C.F.R. § 1026.4(b).  Both the statute and Regulation Z include a broad range of charges imposed as a cost for the consumer to obtain the "actual use" of credit, including but not limited to: loan fees, finder's fees, fees for credit investigations or reports, borrower-paid mortgage broker fees, and insurance premiums protecting the creditor against default.  *Id.*; 15 U.S.C. § 1605(a).  Those categories are examples, not an exhaustive list.  15 U.S.C. § 1605(a) ("Examples of charges which are included in the finance charge include . . ."); *see Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 111 (2d Cir. 2025) ("Where 'including' is used to introduce a list of examples, such examples are to be viewed as 'illustrative, not exhaustive.'" (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012)).  The statute and the regulation specifically exclude "any charge of a type payable in a comparable cash transaction."  15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(a).  TILA and Regulation Z also explicitly exclude fees and amounts imposed by third-party closing agents that the creditor does not require and does not retain.  15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(a)(2).

The Express Fee is a finance charge.  The "amount financed" under TILA is "the amount of credit of which the consumer has actual use."  15 U.S.C. § 1638(a)(2)(A).  The "finance

35

charge" is, separately, the cost the consumer pays for the privilege of that use.  *Id*. § 1605(a).

The Express Fee is such a cost.  Maximizing the time during which the consumer has access to

liquidity is not just an important part of Instant Cash, but its *defining feature*.  The name says it

all: Instant. Cash.  As alleged in the Amended Complaint, Brigit's intended users are consumers

living paycheck to paycheck "who turn to EWA providers *for the precise reason that their need*

*for cash is urgent and cannot wait*."  Compl. ¶ 43 (emphasis added).  It is therefore unsurprising

that "the vast majority of EWA users pay expedite fees to obtain immediate funds

disbursement."  *Id.* ¶ 44.

Brigit asserts that the Express Fee "is no different from same-day or overnight shipping

for online purchases—the product is unchanged."  Dkt. No. 35 at 6.  Not so.  Brigit promotes

Instant Cash as a way to get money "instantly," "quickly," "ASAP," "within seconds," "when

you need it," and "in case of emergency."  *Id.* ¶ 78.  The time to receipt is an integral part of the

product.  A consumer who needs short-term liquidity and turns to a product called "Instant Cash"

has one, and only one, way to receive funds instantly: pay the Express Fee.  The consumer who

pays the fee receives the borrowed funds on Day 1 rather than Day 3 or later—and thereby

obtains two to three additional days of actual use of borrowed capital within the loan's fixed

repayment window.  Brigit is deprived of the use of that capital for the same period.  Though the

consumer need not opt for the Instant Cash product, when she does so, the speed and the longer

term of the loan is a material feature of the credit extended, so the fee is part of the cost of the

credit.  *See Orubo*, 780 F. Supp. 3d at 938 ("The time at which funds are received is a material

term of credit."); *Cf*. 89 Fed Red. at 61362 ("Speed of access to funds is an integral and defining

aspect of earned wage products.  They are designed to address—and marketed as addressing—

the liquidity problem that arises between the accrual of wages and their actual payment.  That

36

problem necessarily occurs in a very short period, so the value of this type of credit to the consumer includes the rapid availability of funds.").

The Express Fee bears a "necessary connection" to the extension of credit. *See Pfennig*, 541 U.S. at 241. It does not convey any value other than the extended actual use that the consumer enjoys and that Brigit correspondingly foregoes. The fee exists only because the loan exists; it determines when the consumer obtains actual use of the loan proceeds, and it is payable only within the loan transaction. Moreover, the fee is "imposed" by Brigit within the meaning of the statute and the regulation. Brigit designed the fee, set its price, built it into the architecture of the Instant Cash transaction, and collects it directly from the consumer at the time of repayment. TOS at 11.

It is immaterial that the consumer can avoid the Express Fee by waiting an additional two to three days and foregoing the use of capital for that additional period. It is invariably the case that a lender who offers one credit product will offer other options for borrowers who want the use of capital on different terms—on a different date, for a different duration, with different repayment options. The fact that the putative borrower can choose among options does not make each charge associated with those options any less of a finance charge. A lender, for example, may offer a loan with two different options, one that remains variable over its duration and a second that permits the borrower to convert the loan to a fixed-rate obligation at a future date. Such convertible adjustable-rate mortgages are common. It also is common that a borrower who elects to have the option in the future to convert the loan may have to pay an additional charge for that feature. Such a charge is "voluntary." *See* Dkt. No. 32 at 17; Dkt. No. 35 at 6. The borrower can avoid it by opting for the version of the loan that remains variable. But, as the Fed has recognized, the fact that the rate conversion charge is not obligatory does not make it any

less incident to the extension of credit. *See* Truth in Lending, 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996). For the borrower who elects to receive the loan that is convertible, the charge is the cost it must pay for the actual use of credit extended by the lender. In other words, those charges are costs that, although the borrower could avoid by forgoing a material feature of the credit, represent part of the cost of obtaining the credit of which the borrower has actual use. *See* 15 U.S.C. § 1605(a).

Regulation Z's treatment of other optional charges confirms the point. Credit life and disability insurance premiums, for example, are charges that a borrower elects but is not required to purchase. Yet Regulation Z classifies them as finance charges by default. 12 C.F.R. § 1026.4(d)(1); *see also* 15 U.S.C. § 1605(c). A creditor may exclude these charges from coverage only by satisfying specific disclosure conditions (e.g., disclosures must be in writing, and the consumer must provide "an affirmative written request" for the insurance after receiving the disclosures). 12 C.F.R. § 1026.4(d)(1). Unless those conditions are met, the premium is a finance charge—even though the borrower chose to purchase it and even though the borrower received something of independent value. *See also Lifanda v. Elmhurst Dodge, Inc.*, 237 F.3d 803, 805, 808–09 (7th Cir. 2001) (holding that optional auto theft insurance purchased as an incident to the extension of credit for buying a car was a finance charge). The Regulation thus does not treat optionality as a reason itself to exclude a charge from the finance charge definition.

The Express Fee here is functionally no different. A consumer who elects Instant Cash with expedited disbursement and pays the Express Fee has obtained a particular credit product— one in which she receives the borrowed funds immediately. The Express Fee is the cost of obtaining that credit on those terms. The fact that the consumer could have elected a different

version of the product—one with slower disbursement and no fee—does not make the Express Fee any less incident to the credit than the credit in the convertible-adjustable-rate-mortgage example addressed by the Fed.

The Eleventh Circuit's decision in *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996), does not compel a different result. In that case, Citibank included a $21 FedEx fee in the "Amount Financed" section of a TILA Disclosure Statement rather than under the "Finance Charge" section. *Id.* at 579. The fee was charged to the customer as an expense in connection with Citibank's delivery of a portion of the funds to pay off the customer's prior debts to Citibank and to other lenders. *Id.* at 578–79. The court concluded that Citibank had not made a mistake in including the charge as a portion of the amount financed rather than as a finance charge. *Id.* at 579. There was no evidence that "Citibank required the fee before it would extend credit to the Veales." *Id.* Instead, the delivery charge was provided as a separate service by Citibank: "the delivery charge was the result of expediting the pay outs to the other financial institutions in an effort to save the Veales additional interest expense." *Id.* In so holding, the court distinguished but did not overrule its own prior decision in *Rodash v. AIB Mortgage Co.*, 16 F.3d 1142 (11th Cir. 1994). In *Rodash*, the court concluded that a $22 FedEx fee that the bank charged to pay off a then-existing mortgage loan was a finance charge because, as part of the new loan, the consumer was required to pay off the old loan. *See id.* at 1147–48. *Rodash* held that the FedEx fee was a finance charge because without the mailing, "the home equity transaction would not have been consummated." *Id.* a 1148. By contrast, in *Veale,* the borrowers "could have chosen not to pay the Federal Express fee and the bank did not require it." 85 F.3d at 579.

*Veale* would be analogous to this case if Brigit offered an option pursuant to which it

would deliver the cash that a consumer borrowed not to the consumer directly but to some other creditor to whom the consumer owed money.  The consumer would receive the actual use of capital at the same time regardless of whether she paid an extra fee; but if she wanted cash to be sent to the other creditor (e.g., in order to avoid having to send the money herself or to save transaction costs), she would have to pay for the service.  Under that hypothetical, it could be said that Brigit would not have "required the fee before it would extend [the] credit." *Id.*  The consumer, in effect, would be using its own money borrowed from Brigit to pay for an ancillary service.  It would properly be treated as an amount financed.

But here there was no ancillary service.  The Express Fee was "[p]art-and-parcel of the fulfillment of the transaction." *Rodash*, 16 F.3d at 1148.  Without the fee, there was no "instant cash."  "The purpose of TILA is to make various credit terms available to consumers, so they can more easily compare such terms between banks and other financial institutions.  Consequently, financial institutions may not bury any costs of credit as such indirection would hinder consumers in comparing credit terms and making the best informed decision on the use of credit." *Id.*

Defendant's remaining cited authorities do not alter the analysis.  *Stutman v. Chemical Bank*, 1996 WL 539845 (S.D.N.Y. Sept. 24, 1996), and *Adamson v. Alliance Mortgage Co.*, 861 F.2d 63 (4th Cir. 1988), both involved fees imposed after the loan was originated: in *Stutman*, for services in connection with extinguishing a debt *three years* after the extension of the loan, 1996 WL 539845, at *1, *3, and in *Adamson*, for releasing a deed of trust after a mortgage was fully repaid, 861 F.2d at 64–66.  In neither case was the fee connected to the original extension of credit or to a material term of the loan.  *See Adamson*, 861 F.2d at 65 ("The release fees were not charged during the transaction in which credit was extended, but as an incident to the formal

extinguishment of the Lenders' liens after the debts had been repaid.  The loans were in no way conditioned on the plaintiffs agreeing to pay the release fees; the record reveals no evidence that the plaintiffs were ever under any legal obligation to pay the fees."); *Stutman*, 1996 WL 539845, at *3 (explaining that the fee "was incident not to the extension of the loan, but rather to the extinguishment of the debt, was not a condition of the loan, and should not be included within the finance charge").  Those fees bear no resemblance to Express Fees charged at the time of the advance as the price of receiving the borrowed funds immediately.

Finally, Brigit cites *Golubiewski v. Activehours, Inc.*, 2024 WL 4204272, at *6 (M.D. Pa. Sept. 16, 2024), for the proposition that "optional tips and fees" for EWA products are not finance charges under TILA.  *Golubiewski* is unpersuasive in several respects, as other courts have observed.  *See, e.g.*, *Orubo*, 780 F. Supp. 3d at 937; *Johnson*, 2025 WL 2299425, at *5. For one, the court in *Golubiewski* suggested that TILA requires "a *necessary* condition for credit," when *Pfennig* makes clear that what is required is instead only a "necessary connection." 2024 WL 4204272, at *6.  Furthermore, the court failed entirely to address the fact that the timing of an advance can be a material term of the loan, noting simply that because an alternative standard delivery service existed, "users c[ould] choose whichever option they prefer."  *Id.* at *4. The Court disagrees with that conclusion for all the reasons already provided.

Brigit's Instant Cash involves an extension of consumer credit under TILA and the MLA. Plaintiffs have therefore stated a claim for relief, and Defendant's motion to dismiss the Amended Complaint is denied.

## II.  The Motion to Compel Arbitration Is Denied.

Brigit also moves to compel arbitration pursuant to the arbitration clause in the TOS. Dkt. No. 32 at 25–26.  At oral argument, however, it conceded that the arbitrability of the TILA

and MLA claims "rises and falls on the merits" of the consumer credit question.  Tr. at 25:18–26:18.[16]  That is because the MLA makes it unlawful for any creditor to extend consumer credit to a covered borrower with respect to which "the creditor requires the borrower to submit to arbitration."  10 U.S.C. § 987(e)(3); *see also* 32 C.F.R. § 232.8(c).  The statute further provides that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such member, or any person who was a covered member or dependent of that member when the agreement was made."  10 U.S.C. § 987(f)(4).  And any credit agreement that fails to comply with the MLA or that contains a prohibited provision "shall be void from the inception of such agreement."  10 U.S.C. § 987(f)(3); 32 C.F.R. § 232.9(c).  Brigit's own TOS recognizes this prohibition.  Section 20.5 provides that if a user is a "covered borrower" as defined by the MLA and 32 C.F.R. § 232.3, "the Arbitration Agreement does not apply to you and you do not need to opt out of or take any action to ensure inapplicability of the Arbitration Agreement."  TOS at 24; *see also id*. at 29.

The Amended Complaint alleges that all three named Plaintiffs were active-duty servicemembers when they received Instant Cash advances.  Compl. ¶¶ 13–18, 119–30.  They are therefore "covered borrowers" within the meaning of the statute.  *See* 10 U.S.C. § 987(i)(1); 32 C.F.R. § 232.3(g).  Brigit has not argued otherwise.  *See* Dkt. No. 32 at 12 n.18 ("reserv[ing] the right to challenge" at a later stage "whether Plaintiffs are 'covered member[s]' under the MLA").  Because Plaintiffs are covered borrowers and have plausibly alleged that Instant Cash extends consumer credit under the MLA, the arbitration clause is unenforceable.  *See Steines v. LoanMax Title Loans*, 113 F.4th 1338, 1343 (11th Cir. 2024) ("The statutory text of the MLA

---

[16] Brigit did not make a similar concession with respect to Plaintiffs' state law claims, *see* Tr. at 26:9–18, but those claims have since been voluntarily dismissed, *see* Dkt. No. 65.

couldn't be clearer that where the MLA applies, the FAA does not."); *see also Burrison*, 2026 WL 444638, at \*3–5.

## CONCLUSION

Defendant's motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) or, alternatively, to compel arbitration is DENIED.

SO ORDERED.

Dated: March 31, 2026
      New York, New York                           LEWIS J. LIMAN
                                      United States District Judge